## Richmond

### JACQUALYNN A. SHANK, ET AL. v. DEPARTMENT OF SOCIAL SERVICES OF THE CITY OF VIRGINIA BEACH, ET AL.

November 24, 1976.

Record No. 751276.

Present, All the Justices.

Sam Garrison (Mundy & Garrison, on brief), for appellants.

Arthur Bergman, Assistant City Attorney (Dandridge H. Yon, Assistant City Attorney; John K. Moore; Moore, Brydges & Cohen, on brief), for appellees.

POFF, J., delivered the opinion of the court.

This appeal concerns the custody of two male infants born of the marriage of one of the appellants, Jacqualynn A. Shank (hereinafter, the mother), to Ronald Allen Slapnicker. The appeal is addressed to a final order entered June 25, 1975, which, in effect, sustained the demurrer filed by appellee Department of Social Services of the City of Virginia Beach (hereinafter, the Department), and we review the facts as they appear from the pleadings.

The natural father died on April 4, 1971. Some time thereafter, the Department, acting upon complaints of child abuse, took the infants into protective custody and placed them in foster homes. Upon appeal from an order entered by the Juvenile and Domestic Relations Court of the City of Virginia Beach, the trial court conducted four evidentiary hearings. By order entered June 19, 1973, the trial court found that "it is for the best interest of [the infants] and for the best interest of the State that such [infants] be separated permanently from [their] sole living parent" and ordered that their "care and custody . . . be committed to [the Department] with the right to place . . . for adoption." This order was never appealed. Before it was entered, the mother had married appellant Stephen M. Shank, but Shank was not a party to that litigation.

On June 21, 1974, the Department placed the boys for foster care in the Ohio home of their paternal uncle, appellee Gary L. Slapnicker, and his wife, appellee Linda K. Slapnicker (hereinafter, the foster parents). In February 1975, the natural mother made a telephone inquiry concerning the legal status of her sons and was advised that no adoption proceedings had been commenced. On April 17, 1975, with the written consent of the Department, the foster parents filed a petition for adoption. On June 2, 1975, appellants filed a "Petition and Bill of Complaint" seeking custody of the children, then five and six years of age, and a temporary injunction against adoption by the foster parents pending adjudication of custody; in the alternative, appellants requested "leave to file pleadings and intervene as parties in the matter of the proposed adoption".

Appellants did not challenge the parental fitness of the foster parents. In support of their prayer for custody, they pled "substantial change of circumstances" affecting the mother's

parental fitness. Conceding that the mother was once, during a period of emotional stress, guilty of abusing her children, they alleged that she has since received psychiatric treatment and is now emotionally stable and fit to be a proper parent to infant children. Appellants further alleged that their marriage has been harmonious, that a female child has been born to them, that the family enjoys a good standing in the community, and that the family is financially self-sufficient.

Finding from the face of the pleadings that the June 19, 1973 order "is dispositive of the issue of custody", the trial court denied appellants' several prayers. No order has been entered on the foster parents' adoption petition, and they have voluntarily suspended further proceedings pending this appeal.

The crucial question is whether the June 19, 1973 order effectively severed the parental rights of the natural mother. We hold that it did. Our holding controls related questions, and we affirm.

This order was not "modified or vacated" under Rule 1:1. It was not appealed. It was as final as if affirmed by this Court on appeal and is immune from collateral attack, except upon jurisdictional grounds.

Appellants do not challenge the trial court's jurisdiction over the parties or over the subject matter. Rather, their position seems to be that the trial court exceeded its jurisdiction insofar as its decree sought to divest the mother of custody *permanently*. They say that under the common law rule a court "retains the power to decide issues concerning the custody of children throughout their infancy and to affirm, modify or revoke any previous orders or decrees, however valid when entered".

But, as applied to a parent's *right* to custody, as distinguished from other issues concerning custody, the common law rule has been modified by statute. As we noted in *Lowe* v. *Grasty*, 203 Va. 168, 172, 122 S.E.2d 867, 870 (1961), until 1960 courts had no statutory authority to take a neglected child from its parent and commit its custody to a local board of public welfare or department of social services and grant such agency power to place for adoption. Under Acts, 1960, ch. 331, the General Assembly cured that omission by adding two paragraphs to Code § 16.1-178 which read in pertinent part:

"Commitment of a child . . . shall not per se confer the right upon the receiving agency to place such child for adoption. If proper studies indicate that it is for the child's best interest and that of the State that such child be separated permanently from its parent, parents or guardian, the order of commitment shall so state . . ., in which event the agency having custody of the child shall be free to make such permanent plans for the child as may otherwise be within the scope of the agency's authority." Code § 16.1-178 (Repl. Vol. 1975).

By the same Act, former Code § 63-351 was amended to authorize a board under such circumstances to grant the written consent required by that section.

The 1960 amendments were especially suited to cases of child abuse and neglect. The General Assembly created two distinct remedies fashioned to fit diverse circumstances in such cases. One permits the courts to commit the child to an "agency" but withhold power to place for adoption. When applied, this remedy effects a transitory change in the child's custodial status and a provisional suspension of the parent's custodial rights without affecting other parental rights. This remedy is designed for the case of a parent who shows extenuating circumstances and demonstrates his potential for rehabilitation as a fit parent. When the court applies this remedy, the parent may subsequently reacquire custody by showing changed circumstances.

The second remedy, designed for a different case, has different consequences. The courts are empowered to commit an abused or neglected child to an "agency" and "to make such permanent plans for the child as may otherwise be within the scope of the agency's authority." Under Code § 63.1-56 (Repl. Vol. 1973), a local board has authority "to place for adoption, and to consent to the adoption . . . when the order of commitment . . . provides for the permanent separation of such child from his parent or parents." Code § 16.1-178 directs that the order of commitment *shall* so provide when it appears that permanent separation "is for the child's best interest and that of the State."

Unlike the first remedy, which authorizes only a suspension of the custodial rights of a parent, the second remedy authorizes a severance of all parental rights, including the right to place for adoption and the right to consent to adoption. The effect of its application is to render the parent a legal stranger to the child. If

that effect seems harsh, it must be remembered that the effects of child abuse and neglect are often brutal and sometimes fatal, and in such cases the General Assembly has decided as a matter of public policy that parental rights must yield to the best interest of the child and that of the State.

■ Our construction of the legislative design is reinforced by an analysis of Code § 63.1-204 (Repl. Vol. 1973). That statute provides that when an agency has custody of a child under a voluntary entrustment agreement in which the parent consents to "permanent separation", the parents may revoke the agreement and reacquire custody at any time before the child has been placed in the home of adoptive parents or, "upon proof of fraud or duress", at any time before entry of a final order of adoption. The General Assembly could have made similar provision for cases where the agency holds custody under permanent-separation orders of commitment. Significantly, although the statute expressly refers to such cases, no such provision was made. We conclude that the omission was purposeful. Clearly, the legislature intended that permanent-separation orders entered on competent evidence heard by an impartial judge should have greater finality than extra-judicial agreements which are sometimes executed hastily in times of temporary privation or sudden tragedy and always under great emotional stress. *See, e.g., Rocka* v. *Roanoke Co. Dep't. of Welfare*, 215 Va. 515, 211 S.E.2d 76 (1975).

Here, after four separate hearings, the trial court applied the second remedy. Based upon evidence concerning the nature and extent of the mother's abuse of her sons, the judge decided that their best interest and that of the State required permanent separation from their mother and committed their custody to the Department with the power to place for adoption. We hold that the effect of his order was to sever all parental rights of the mother. There was, therefore, no predicate for appellants' prayer for injunction pending adjudication of custody, and the injunction was properly denied.

■ Appellants petitioned to "intervene as parties in the matter of the proposed adoption". Under Rule 2:15 a new party admitted "by leave of court [may] assert any claim or defense germane to the subject matter of the suit." Here a claim of right to adopt did not lie, because the appellants did not have the Department's written consent. Code § 63.1-225 (Repl. Vol. 1973).

Nor was any cognizable defense available to appellants. Once the mother became a legal stranger to the children, appellants' only viable defense to the petition to adopt was parental unfitness of the petitioners. Appellants asserted no such defense, and we hold that the trial court did not abuse its discretion in denying their petition to intervene.*

Finding no error below, we affirm the judgment.

*Affirmed.*

HARRISON, J., dissenting.

The majority holds that the natural mother of the two infants involved here has no standing, as a matter of law, to intervene in a proceeding for their adoption. The opinion recites that the June 19, 1973 order, pursuant to Code § 16.1-178 (Repl. Vol. 1975), severed all parental rights of the natural mother, rendered her a legal stranger to the children, and therefore her only viable defense to the petition to adopt was the parental unfitness of Mr. and Mrs. Slapnicker.

Mrs. Shank, the natural mother, has been denied the last possible opportunity to establish her suitability to regain custody of her children and to contest their adoption. There is no proceeding that can be as awesome, or is as final, as a proceeding for the adoption of one's child. It results in a parent being divested of all legal rights and obligations with respect to the child, and in freeing the child from all legal obligations of obedience and maintenance with respect to the natural parent.

The record before us contains no testimony regarding the circumstances surrounding the entry by the court below of the June 19, 1973 order, and the order recites only that it appeared to be in the best interest of the children and the state for the action to be taken. In their petition appellants recite that Mrs. Shank was charged with abusing the children. She alleges that this occurred during a period of time in which she was emotionally disturbed as a result of her recent widowhood, the simultaneous death of both her parents in an airplane crash, her lack of family and friends in the Virginia Beach area and her then state of acute depression. Appellants allege that Mrs.

---

*In *Szemler* v. *Clements*, 214 Va. 639, 202 S.E.2d 880 (1974), the trial court permitted the natural mother to participate as a party in opposition to a petition for adoption. But there, parental rights had not been judicially severed.

Shank has been completely réstored to health and rehabilitated; has a happy second marriage; and is now living in Roanoke peacefully and harmoniously with her husband. She professes to have a wide circle of friends and acquaintances and to enjoy a warm and close relationship with her husband's family. The mother also alleges that she has given birth to another child, which occurred only after medical doctors, competent in the field of psychiatry, had pronounced her fully fit emotionally to care for and have the custody of one or more infant children.

The prayer of appellants' petition was that the adoption proceeding be suspended and enjoined until their petition for restoration of custody be considered; and that if the adoption proceedings be not enjoined and suspended, that they be permitted to intervene therein as parties. The court below summarily denied the petition, upon the ground that its order of June 19, 1973, was dispositive of the issue of custody, and also denied appellants the right to intervene in the adoption proceedings.

The State seeks to rehabilitate the most depraved criminal in its penitentiary and holds out to him hope of being restored to society. Notwithstanding this, by our affirmation here we hold that once a court, acting under Code § 16.1-178, orders that a child be separated permanently from the parent, such parent, regardless of circumstances or conditions, can never be considered as a proper person to regain and have the custody of the child. No amount of rehabilitation by that erring parent can help.

In *Dyer* v. *Howell*, 212 Va. 453, 184 S.E.2d 789 (1971), a husband who killed his wife was formally divested of the custody of his infant daughter, Kathy. The husband subsequently attended college, was gainfully employed, remarried, became the father of a second child and sought to regain custody of Kathy. While he was not successful, Dyer's petition to regain such custody was heard and considered. It was denied upon the ground that Dyer had not shown that it would be in the best interest of his daughter to restore her custody to him. Significantly, we said there: "In so holding, we have not overlooked the expressed and obviously sincere desire of the father to have the child with him or his claimed right as the natural parent, which in different circumstances we would respect, to be awarded her custody." 212 Va. at 458, 184 S.E.2d at 793.

It is not contended that the June 19, 1973 order was of no force and effect. In *Dyer, supra,* and more recently in *McEntire* v. *Redfearn,* 217 Va. 313, 227 S.E.2d 741 (1976), we recognized the importance of an unappealed, merit adjudication by a court of competent jurisdiction determining custody of children based upon then existing facts. Admittedly, when such an adjudication is made, the parent is no longer clothed with the parental presumption accorded natural parents in a dispute with non parents. However, in an adoption proceeding, as in custody cases, the welfare of the child is always the paramount consideration. All that Mrs. Shank seeks in this case is that she be permitted to intervene before the finality of adoption occurs, and be accorded an opportunity to attempt to establish that the conditions and circumstances which precipitated the 1973 order have so completely changed since that time that it would now be in her children's best interest for their custody to be restored to her. Instead, the majority has said to her, the natural mother, that the only viable defense to a petition filed to adopt her children is the "parental unfitness" of the adopting petitioners. There are many instances where adopting parents could not be shown as unfit, but where the welfare of the children they sought to adopt would not be best promoted by such adoption.

Important to this decision is the fact that when appellants filed their petition in the lower court, the permanent custody of the two children involved had never been awarded the Slapnickers and the Slapnickers had just filed a petition for their adoption. It is inconceivable that the General Assembly intended that, under these circumstances, action taken by a court pursuant to Code § 16.1-178 could result in denying a natural mother standing to seek the custody of her children or standing to protest their adoption. In effect, we have accorded action by a court under Code § 16.1-178 the same dignity and finality as was formerly accorded only a final order of adoption.

I would reverse, stay the proceeding for adoption, permit appellants to intervene, and grant them a hearing on their petition. If the evidence establishes that the best interest of the infants would be served by permitting Mr. and Mrs. Slapnicker to adopt them, as recommended by the Department of Social Services of the City of Virginia Beach, such adoption can then be so ordered. *A fortiori,* and while Mrs. Shank may have a heavy burden, if she can establish by proper evidence, and to the satisfaction of the court, that the best interest of the children

would be served by restoring to this natural mother their custody and by denying the petition for adoption, this course should be followed. For the court to do otherwise, in the face of such evidence, it would have to repudiate every case we have decided involving the custody or adoption of infants.

I'ANSON, C.J., and COCHRAN, J., join in dissent.