**Alexandria**

CHAE POK EDWARDS

v.

COUNTY OF ARLINGTON

No. 0220-86

Decided November 4, 1987

COUNSEL

Larry Packett, for appellant.

Mark Towery, Assistant County Attorney (Charles G. Flinn, County Attorney, on brief), for appellee.

OPINION

**BENTON, J.** — Chae Pok Edwards appeals from an order of the circuit court terminating her residual parental rights pursuant to Code § 16.1-283(B).[1] Because we conclude that the trial court's findings are not supported by clear and convincing evidence, we reverse its decision and remand the case.

Chae Pok Edwards was born in Chaunvado, Korea in 1954 to parents who were peasant farmers. She received one to three years of formal education and was a farm laborer most of her life in Korea. In 1979, she gave birth to a daughter, Melody, whose natural father was a United States serviceman. She did not marry Melody's father but instead, when Melody was six months old, married Charles Allen Edwards, also a United States serviceman. She subsequently moved with Melody to the United States in 1980. Upon their arrival in the City of Alexandria, Edwards' husband sent $200 to her but made no further attempts to support her. She has not lived with her husband since she moved to the United States.

---

[1] In relevant part, Code § 16.1-283(B) states:

The residual parental rights of a parent or parents of a child found by the court to be neglected or abused and placed in foster care as a result of (i) court commitment . . . may be terminated if the court finds, based upon clear and convincing evidence, that it is in the best interest of the child and that:

1. The neglect or abuse suffered by such child presented a serious and substantial threat to his life, health or development; and

2. It is not reasonably likely that the conditions which resulted in such neglect or abuse can be substantially corrected or eliminated so as to allow the child's safe return to his parent or parents within a reasonable period of time.

Proof of any of the following shall constitute prima facie evidence of the conditions set forth in subdivision B 2 hereof:

    (a) The parent or parents are suffering from a mental or emotional illness or mental deficiency of such severity that there is no reasonable expectation that such parent will be able to undertake responsibility for the care needed by the child in accordance with his age and stage of development. . . .

One month after their arrival in Alexandria, Edwards and Melody moved to Washington, D.C. On January 5, 1981, neighbors in her apartment building complained to the police that water was leaking from her apartment. Edwards stated that the water pipes burst during a snowfall because of cold temperature and faulty plumbing. The police reported that water from the bathroom flooded the apartment, that the apartment was in total disarray, that Melody was lying naked on a bed, that the apartment was cold, and that Edwards was uncooperative and refused to give information. Edwards and Melody were taken to the District of Columbia's Child Protective Services. Edwards reportedly became agitated while there and was taken to St. Elizabeth's Hospital. Melody was taken to an infant home.

Edwards was diagnosed upon her admission to the hospital as having a schizophrenic disorder.[2] She was released, however, nine days following her admission to the hospital after a reevaluation

---

[2] The American Psychiatric Association's *Diagnostic and Statistical Manual of Mental Disorders*, (3d ed. 1980)(hereinafter referred to by its familiar abbreviation "DSM-III") contains, in part, the following diagnostic criteria for a Schizophrenic Disorder:

A. At least one of the following during a phase of the illness:

(1) bizarre delusions (content is patently absurd and has no possible basis in fact), such as delusions of being controlled, thought broadcasting, thought insertion, or thought withdrawal

(2) somatic, grandiose, religious, nihilistic, or other delusions without persecutory or jealous content

(3) delusions with persecutory or jealous content if accompanied by hallucinations of any type

(4) auditory hallucinations in which either a voice keeps up a running commentary on the individual's behavior or thoughts, or two or more voices converse with each other

(5) auditory hallucinations on several occasions with content of more than one or two words, having no apparent relation to depression or elation

(6) incoherence, marked loosening of associations, markedly illogical thinking, or marked poverty of content of speech if associated with at least one of the following:

(a)  blunted, flat, or inappropriate affect

(b)  delusions or hallucinations

(c)  catatonic or other grossly disorganized behavior

B. Deterioration from a previous level of functioning in such areas as work, social relations, and self-care.

C. Duration: Continuous signs of the illness for at least six months at some time during the person's life, with some signs of the illness at present. The six-month

disclosed no psychosis. On February 9, 1981, Edwards was evaluated by a Korean psychiatrist, Dr. Chin, who found Edwards to be oriented, cooperative, not psychotic, rational, and exhibiting appropriate behavior. He also determined that Edwards needed medication, social services intervention, and medical treatment for hypothyroidism.[3] Dr. Chin concluded that Edwards was under

period must include an active phase during which there were symptoms from A, with or without a prodromal or residual phase, as defined below.

> *Prodromal phase*: A clear deterioration in functioning before the active phase of the illness not due to a disturbance in mood or to a Substance Use Disorder and involving at least two of the symptoms noted below.

> *Residual phase*: Persistence, following the active phase of the illness, of at least two of the symptoms noted below, not due to a disturbance in mood or to a Substance Use Disorder.

Prodromal or Residual Symptoms

(1) social isolation or withdrawal

(2) marked impairment in role functioning as wage-earner, student, or homemaker

(3) markedly peculiar behavior (e.g., collecting garbage, talking to self in public, or hoarding food)

(4) marked impairment in personal hygiene and grooming

(5) blunted, flat, or inappropriate affect

(6) digressive, vague, overelaborate, circumstantial, or metaphorical speech

(7) odd or bizarre ideation, or magical thinking, e.g., superstitiousness, clairvoyance, telepathy, "sixth sense," "others can feel my feelings," overvalued ideas, ideas of reference

(8) unusual perceptual experiences, e.g., recurrent illusions, sensing the presence of a force or person not actually present

\* \* \*

D. The full depressive or manic syndrome (criteria A and B of major depressive or manic episode), if present, developed after any psychotic symptoms, or was brief in duration relative to the duration of the psychotic symptoms in A.

E. Onset of prodromal or active phase of the illness before age 45.

F. Not due to any Organic Mental Disorder or Mental Retardation.

*Id.* at 188-190.

   [3] Although there was no evidence offered in the trial court concerning the effects of hypothyroidism, medical and psychiatric literature report that it has been long established that hypothyroidism, if untreated, may produce signs and symptoms of psychosis and cognitive impairment. See 2 J. Wyngaarden & L. Smith, Jr., *Cecil Textbook of Medicine* 1287-88 (7th Ed. 1985); R. Petersdorf, R. Adams, E. Braunwald, K. Isselbacher, J. Martin & J. Wilson, *Harrison's Principles of Internal Medicine* 622 (10th ed. 1983); Haggerty, Evans & Prange, *Organic Brain Syndrome Associated With Marginal Hypothyroidism*, 143 Am. J. Psychiatry 785 (1986); Whybrow, Prange & Treadway, *Mental Changes Accompanying Thyroid Gland Dysfunction: A Reappraisal Using Objective Psychological Measurement*, 20 Archives of General Psychiatry 40 (1969); Asher, *Myxoedematous Madness*, 2 Brit. Med. J. 555 (1949). Some individuals with hypothyroidism apparently exhibit a disturbance which is easily mistaken for schizophrenia, and "[i]nitial misdiagnosis is not uncommon." Whybrow, 20 Archives of Gen. Psychiatry at 49-51. In a study of a

psychological pressures due to language and cultural barriers, and he changed Edwards' diagnosis from schizophrenia to "adjustment disorder with anxious mood."[4]

The Superior Court of the District of Columbia and a social worker assigned to the case determined that Edwards had difficulty communicating in English but that she was fit to care for Melody. Melody was returned to Edwards, who, by then, had been evicted from her apartment and was residing in Arlington. Edwards was divorced from her husband in June 1981.

In August 1981, Edwards became involved in a dispute with her roommate and apparently refused her roommate's demand that she leave the apartment. Her roommate called the police, who took Edwards and Melody to a clinic. Edwards was transferred to

random sample of persons with thyroid gland disfunction, researchers reached the conclusion that:

> it is apparent that a disturbance of mental function was present in both the hyperthyroid and hypothyroid group, a finding grossly consistent with the consensus of previous reports. In seven hyperthyroid and six hypothyroid patients the disruption was profound and considered sufficient to constitute a psychiatric illness (76% of the group).
>
> Most apparent was *an impairment of cognitive function.* This occurred particularly in the hypothyroid group where not only was there subjective impairment of recent memory with confusion but also a profound difficulty with psychological tests demanding attention, abstraction, and memory.

*Id.* at 59. Moreover, "studies of mental disturbance occurring in unselected hypothyroid patients support the clinical impression that in hypothyroidism there is an intellectual impairment which usually improves with thyroid replacement." *Id.* at 51 (citations omitted).

   [4] DSM-III at 300-01 describes, in part, the following diagnostic criteria for "adjustment disorder":

> A. A maladaptive reaction to an identifiable psychosocial stressor, that occurs within three months of the onset of the stressor.
> B. The maladaptive nature of the reaction is indicated by either of the following:
>    (1) impairment in social or occupational functioning
>    (2) symptoms that are in excess of a normal and expectable reaction to the stressor
> C. The disturbance is not merely one instance of a pattern of overreaction to stress or an exacerbation of one of the mental disorders previously described.
> D. It is assumed that the disturbance will eventually remit after the stressor ceases or, if the stressor persists, when a new level of adaptation is achieved.
> E. The disturbance does not meet the criteria for any of the specific disorders listed previously or for Uncomplicated Bereavement.

The category Adjustment Disorder with Anxious Mood "should be used when the predominant manifestation involves such symptoms as nervousness, worry, and jitteriness." *Id.* at 301.

Arlington Hospital Psychiatric Unit and then to Northern Virginia Mental Health Institute, where she was diagnosed as having atypical psychosis.[5] Melody was placed in emergency foster care by the Arlington County Department of Human Services (the "department").

Edwards was evaluated as being disoriented and being physically and verbally aggressive. She was described as having a schizophreniform disorder and was placed on antipsychotic medications.[6] In the discharge summary completed on October 7,

---

[5] DSM-III at 202-03 describes the diagnostic classification for atypical psychosis as follows:

This is a residual category for cases in which there are psychotic symptoms (delusions, hallucinations, incoherence, loosening of associations, markedly illogical thinking, or behavior that is grossly disorganized or catatonic) that do not meet the criteria for any specific mental disorder.

Common examples of this category include:

(1) Psychoses with unusual features, e.g., monosymptomatic delusion of bodily change without accompanying impairment in functioning; persistent auditory hallucinations as the only disturbance; transient psychotic episodes associated with the menstrual cycle.

(2) "Postpartum psychoses" that do not meet the criteria for an Organic Mental Disorder, Schizophreniform Disorder, Paranoid Disorder, or Affective Disorder.

(3) Psychoses that would be classified elsewhere except that the duration is less than two weeks, e.g., the symptomatology of a Schizophreniform Disorder, but lasting only three days and there is no precipitating psychosocial stressor.

(4) Psychoses about which there is inadequate information to make a more specific diagnosis. (This is preferable to Diagnosis Deferred, and can be changed if more information becomes available.)

(5) Psychoses with confusing clinical features that make a more specific diagnosis impossible.

[6] DSM-III at 199 describes the diagnostic classification of Schizophreniform Disorder as follows:

The essential features are identical with those of Schizophrenia with the exception that the duration, including prodromal, active and residual phases, is less than six months but more than two weeks. Schizophreniform Disorder is classified outside the category of Schizophrenic Disorders because evidence suggests a greater likelihood of emotional turmoil and confusion, a tendency toward acute onset and resolution, more likely recovery to premorbid levels of functioning, and the absence of an increase in the prevalence of Schizophrenia among family members compared with the general population. The six-month criterion has been chosen because several studies indicate that this is the best single way of differentiating these two disorders to maximize the difference in their external correlates.

1981, Dr. Mardelli stated that it was quite difficult to assess how much of her behavior was psychotic in nature and how much of it was due to limited ability to speak English, psychosocial and cultural deprivation, and lack of an appropriate and supportive social network.

Following her discharge Edwards obtained a job as a waitress and stayed in three different residences. Melody remained in foster care. Edwards visited Melody regularly until the visits were suspended because a social worker determined that Edwards was not cooperating in providing appropriate care for Melody. Specifically, the social worker reported that Melody had allergies and that Edwards was giving candy and other foods to Melody, although she had been told not to do so.[7] From May to July, 1982, Edwards called the social worker continuously, requesting visits with Melody. Edwards was not permitted to visit Melody. In July, Edwards appeared at the office of the department and refused to leave until allowed to see Melody. The social worker explained that Edwards could not see her daughter because she had given her candy and because she had not pursued mental health treatment. The social worker called the police who ordered Edwards off the premises.

Later that month, Edwards was admitted to Northern Virginia Mental Health Center and then transferred to Western State Hospital, where she remained until November of 1982. The record does not reflect the reason for her admission or her diagnosis during her stay at Western State Hospital. Upon her discharge in November, she was employed in Staunton as a live-in housekeeper for a psychologist who was employed at Western State. Edwards cleaned house and cared for the invalid wife of the psychologist.

Melody was permitted to visit Edwards for four to seven days each month in Staunton. According to the plan established by the department, Melody was to be released to Edwards if Edwards complied with the following conditions:

1. Maintain her job situation.

---

[7] The record indicates that Melody had allergic reactions to pollen and grasses but that Melody's test results were negative for eighty different foods.

2.  Contact this agency on a bi-weekly basis regarding her progress.

3.  Limit phone calls to Melody to no more than one call a week.

4.  Maintain emotional stability through contact with mental health professionals in Staunton.

By letter dated September 3, 1983, the psychologist reported to the department that Edwards' job performance was satisfactory and had improved over the past nine to ten months. However, on November 1, the psychologist rated her performance unsatisfactory and stated that she refused to cooperate and would not keep the house clean. In January 1984, the psychologist terminated Edwards, indicating that her job performance was poor. Edwards stated that she was terminated because she refused the psychologist's sexual advances and because his son did not like Melody due to her race.[8] The record indicates that the psychologist stated in one of his letters that neither his son nor his wife liked Melody.

Edwards returned to Arlington and was then placed in a shelter by the department. The social worker reviewed with Edwards the following criteria that she would have to meet in order for Melody to be returned to her custody:

1.  Locate employment and maintain it for 4 months.

2.  Keep appointments at the Mental Health Center.

3.  Attend counseling on a regular basis. Cooperate with a referral for psychological testing.

Edwards gained employment at a fast food restaurant, later at a cleaners, and then as a waitress. Edwards also obtained an apartment satisfactory to the social worker and, in the judgment of the social worker, appeared to be stable. Edwards continued to visit Melody regularly, and Melody was permitted extended visits at her apartment.

---

[8]  Melody's father is black.

In August 1984 Melody was returned to Edwards after the social worker determined that Edwards had done a good job of stabilizing herself and her living conditions. Melody was enrolled in school in September. In November the social worker visited the home and perceived no problem; she was also advised by Melody's teacher that Melody was progressing well.

In January 1985, the social worker received a phone call from Edwards' boyfriend, Mr. Pitman. He stated that he was concerned about Edwards' ability to care for Melody, that Edwards' behavior was erratic and abusive, and that Edwards had refused to pay her share of the rent. The social worker visited Edwards on February 11, 1985, and reported that her usually neat apartment was beginning to look in disarray. The social worker took Edwards to the mental health center where she was given medication. A few days later a mental health worker visited Edwards' apartment and reported:

> I found Chae to be somewhat delusional in that she was talking about not paying her rent anymore because President Reagan told her she did not have to. What was difficult to tell was whether all of this was delusional on Chae's part due to the language barrier that was present. She went on to say that the reason she didn't have to pay rent was because she and her boyfriend are both minorities and she heard on t.v. that because of this reason there may be some rent subsidy that could be offered to them. There was a lot of tension between Chae and the boyfriend that seemed to be aimed directly at Mr. Pittman's family and their interference in the relationship. At this point, after speaking with Chae for about a half hour I determined that she was not committable at this time. She was aware of her surroundings; I found the home to be in order and clean; I found Melody to be well cared for, well adjusted and she seemed quite happy. The home was in good order and clean. An earlier report that had been made to Mrs. Long that Chae was smoking a lot of cigarettes and putting the cigarettes out on the furniture and various locations around the house were not evident while I was present. There were no cigarette butts laying around in ashtrays or furniture that I could detect; as a matter of fact, Chae did not smoke at all while I was in the apartment. I felt the child would be okay at home for the remainder of the

weekend. Mr. Pittman stated that he was going to be staying at the residence at least through April when their lease expires and that he would do as much as he could to help take care of the child. I left DHS numbers as needed for Mr. Pittman and for Chae. I recontacted Foster Care through Pro-Child and spoke with the on-call worker for the weekend, Mary Young and explained the situation to her. There won't be any follow-up necessary at this point. I will stay in touch with Mr. Pittman and Ms. Edwards over the weekend to assess Ms. Edwards' condition to see if she deteriorates and there would be a need for hospitalization.

The social worker returned from vacation two weeks later and received a report that Melody was not in school. Although the social worker expressed concern to Edwards about Melody's absence from school, she testified that Melody had been removed from school by Edwards at the request of Melody's teacher because of chicken pox and that Melody still had pox marks when she went to the apartment. The social worker noted that the house was disorderly, with old food and dirty clothes strewn about, and that Melody was in the bath tub with cold running water. After the social worker dressed her, Melody began to eat potato chips and drink soda. When the social worker asked what she had for breakfast that day, Melody showed her the potato chips and soda. Edwards testified that when the social worker came into her home that day, she was putting cold water on Melody's pox marks to relieve the itching.

The social worker testified that upon the recommendation of a mental health worker she filed a petition in juvenile court to remove Melody. The day after Melody was removed from her home and placed in a foster home, the police responded to a report that Edwards was going around the neighborhood from apartment to apartment looking for Melody. Edwards became belligerent when confronted by the police and was hospitalized at the Northern Virginia Mental Health Institute from February to May 1985.

In May 1985, the department filed a petition in the Juvenile and Domestic Relations District Court of Arlington County requesting that Edwards' residual parental rights with respect to Melody be terminated. The petition alleged that Edwards "is suffering from a mental or emotional illness or mental deficiency of

such severity that there is no reasonable expectation that [she] will be able to undertake the responsibility for the care needed by the child." The juvenile and domestic relations district court ordered that Edwards' residual parental rights be terminated, finding that the requisite showing had been made by the County under Code § 16.1-283(B).

On appeal to the circuit court the records of the department were offered as an exhibit. The trial judge also heard testimony from the social worker, Edwards, and Dr. William Bernet. Dr. Bernet, a psychiatrist, testified that Edwards had a schizophrenic condition. He stated that Edwards "expressed opinions in a very disorganized and fragmented manner" and that "the one aspect of her psychiatric condition that was observable that I thought was most important was I thought she had trouble with her thinking process." Dr. Bernet opined that her condition would interfere with her ability to care for Melody because she would not be able to determine or implement the child's needs. He believed that Melody would have "great difficulty in learning how to think logically" if she remained in the care of her mother and that children growing up in homes such as this have been "found to be mentally below what is expected of them, and they're found to be fearful and . . . anxious."

The circuit court found "that [the department] has shown, by clear and convincing evidence, that [Melody] should be severed from her natural parent and that the residual parental rights of Chae Edwards in [Melody] should be terminated." The court also found that "Chae Edwards suffers from a mental or emotional illness or mental deficiency of such severity that there is no reasonable expectation that [she] will be able to undertake responsibility for the care needed by Melody." It is from this order, terminating her residual parental rights pursuant to Code § 16.1-283(B), that Edwards now appeals.

"The termination of parental rights is a grave, drastic and irreversible action." *Lowe v. Department of Public Welfare*, 231 Va. 277, 280, 343 S.E.2d 70, 72 (1986). The effect of an order terminating parental rights is to permanently sever the relationship between a child and her natural parent and to "render the parent a legal stranger to the child." *Shank v. Department of Social Services*, 217 Va. 506, 509, 230 S.E.2d 454, 457 (1976). In recognition of the harshness of a termination order, the Supreme

Court has said:

> Our prior decisions clearly indicate a respect for the natural bond between children and their natural parents. The preservation of the family, and in particular the parent-child relationship, is an important goal for not only the parents but also government itself. While it may be occasionally necessary to sever the legal relationship between parent and child, those circumstances are rare. Statutes terminating the legal relationship between parent and child should be interpreted consistently with the governmental objective of preserving, when possible, the parent-child relationship.

*Weaver v. Roanoke Department of Human Resources*, 220 Va. 921, 926, 265 S.E.2d 692, 695 (1980); *see also Lowe*, 231 Va. at 280-81, 343 S.E.2d at 72; *Banes v. Pulaski Department of Social Services*, 1 Va. App. 463, 466, 339 S.E.2d 902, 904 (1986).

Code § 16.1-283(B) is a legislative endeavor to ensure the well-being of children shown to be suffering from abuse while protecting the integrity of the parent-child relationship through the utilization of various procedural safeguards. In effect, the statute serves to balance the needs of the child against the rights of the parents and the common interest in preserving family relationships. Thus, before residual parental rights can be terminated under subsection B, the department must show that (1) termination of parental rights "is in the best interests of the child"; (2) that the neglect or abuse suffered by the child presents "a serious and substantial threat to his life, health or development" and (3) that it is "not reasonably likely that the conditions which resulted in such neglect or abuse can be substantially corrected or eliminated so as to allow the child's safe return to [her] parent . . . within a reasonable period of time." Code § 16.1-283(B); *see Lowe*, 231 Va. at 281, 343 S.E.2d at 72. Each of these factors must be proved by clear and convincing evidence. Otherwise stated, the department must present:

> that measure or degree of proof which will produce in the mind of the trier of facts a firm belief or conviction as to the allegations sought to be established. It is intermediate, being more than a mere preponderance, but not to the extent of such certainty as is required beyond a reasonable doubt as in

criminal cases. It does not mean clear and unequivocal.

*Martin v. Pittsylvania County Department of Social Services*, 3 Va. App. 15, 21, 348 S.E.2d 13, 16 (1986)(quoting *Gifford v. Dennis*, 230 Va. 193, 198 n.1, 335 S.E.2d 371, 373 n.1 (1985)).

To establish the third factor, the county relies upon the statutory presumptions of Code § 16.1-283(B)(2)(a) that a prima facie showing may be made by proof that "[t]he parent . . . [is] suffering from a mental or emotional illness or mental deficiency of such severity that there is no reasonable expectation that such parent will be able to undertake responsibility for the care needed by the child in accordance with [her] age and stage of development." We conclude that the department has failed to prove the third factor by clear and convincing evidence because the facts of this case do not support a finding that Ms. Edwards' illness was of a severity sufficient to allow the department to invoke this presumption.

The record establishes that as a child in Korea Edwards received only one to three years of formal education and that prior to coming to the United States in 1980 she worked as a farm laborer. The record also is replete with indications that Edwards has been substantially hindered by her inability to communicate in the English language and by cultural barriers she has encountered since arriving in the United States seven years ago. The references to her English language difficulties are numerous. After her first encounter with the police and social services, the Korean psychiatrist who evaluated Edwards concluded that she suffered psychological pressures due to the significant language barrier that she faced. In returning Melody to Edwards after that initial incident in 1981, the District of Columbia Superior Court and a social worker determined that a significant portion of Edwards' problems stemmed from her difficulty communicating in English.

Following her second commitment in 1981, Dr. Mardelli found it difficult to assess how much of her behavior was due to her limited ability to speak English. During that same time, a social worker wrote that "[i]t is difficult to ascertain just how much English this woman can understand."

The 1983 foster care plan reported: "It is difficult at times to ascertain, due to Mrs. Edwards' language barrier, whether or not

she fully understands all that is being said to her." A year later the psychologist for whom she worked as a housekeeper reported to the social worker that Edwards could not read menus at restaurants or directions on food packages. He stated that he had to read her mail to her and write letters for her; he described her level of functioning as "illiteracy and unfamiliarity with spoken English."

Although the social worker testified at trial that she did not feel that Edwards' language skills were "that limited," she stated that she felt that an interpreter would have been helpful when she talked with Edwards. Moreover, Dr. Bernet, while testifying that he did not believe the language barrier was Edwards' main problem, stated that both her language and different cultural basis created "some bit of a handicap."

The record also establishes that Edwards' language difficulties and the cultural barrier profoundly affected the various diagnoses of her condition. In 1981 when Edwards was initially diagnosed as having a schizophrenic disorder, the reevaluation by Dr. Chin, the Korean psychiatrist, stated that Edwards was oriented, cooperative, rational, not psychotic, and exhibiting appropriate behavior. Because of his finding that Edwards was under psychological pressures caused by language and cultural barriers, Dr. Chin changed her diagnosis to adjustment disorder with anxious mood. Significantly, he concluded that she was in need of social services intervention and medical treatment for hypothyroidism.

After a conflict with a roommate in which she was ordered out of her apartment and removed by the police, Edwards was separated from her daughter a second time and diagnosed as having atypical psychosis. However, the doctor who later evaluated her found it difficult to assess how much of her behavior was psychotic in nature and how much was due to her limited ability to speak English, psychosocial deprivation, and lack of an appropriate and supportive social network. Later that same year the social worker reported that "[i]t is clear that Mrs. Edwards has been having some serious emotional and financial difficulties in adjusting to the U.S. since her arrival in 1980." In 1984 the foster care plan stated that "Edwards . . . is continuing to acculturate herself to this society."

The evidence shows that when Edwards came to the United States in 1980 she was confronted with a situation that required her to become acclimated to a culture and language totally foreign to that to which she had been accustomed for twenty six years of her life. Abundant evidence also exists that those barriers significantly affected her ability to properly function at all times relevant to the issues in this case. Thus, the records of the department and the trial testimony do not provide clear and convincing evidence that Edwards' difficulties sprang from a "mental or emotional illness or mental deficiency of such severity that there is no reasonable expectation" that she will be able to responsibly care for Melody.

Dr. Bernet's testimony does not provide the missing link in the department's burden of proof. He interviewed Edwards on December 12, 1985, and January 3, 1986, for a total of two hours. Although he did not believe that the language barrier that Edwards faced was her main problem, his testimony does not negate the substantial evidence in the record that language and cultural barriers significantly impacted upon her ability to function appropriately. He testified that "what is observable is that if you ask a very specific question of Ms. Edwards, she does understand what you're saying and she usually gives a very specific answer. However, in a more open-ended situation where she is invited to give more information rather than just a specific answer, what tends to happen is for her to ramble and get off the subject, [t]o get on other subjects and to have a very loose mental connection with those subjects." He stated that in his meetings with Edwards "it was a much more open-ended discussion and there was a marked tendency, when I would ask Ms. Edwards a question, for her to get off the subject and say something irrelevant." He observed, however, that "it is possible to go back and figure out what the connections are, but she doesn't provide the connection." Based upon his interviews and review of her history he concluded:

So it's my impression that she had a thought disorder. There was a problem with her thinking in a logical manner, organizing her memory in a logical way, and I also thought that she did have a little bit of difficulty communicating because of language problems. But I didn't think that was the main problem. I thought the main problem had to do with the thinking disorder.

He further opined that the likelihood of change was small because he concluded that she lacked willingness to follow through on treatment; however, he indicated that her level of functioning would improve if she stayed on her medication. He also testified that being out of her culture contributed to her problem because it "makes her just as disabled, probably harder to find solutions for her."

In view of Edwards' history and the other medical evidence in the social services' reports, Dr. Bernet's diagnosis does not provide the degree of proof that is clear and convincing of a mental or emotional illness or mental deficiency of such severity that Edwards has no reasonable expectation of undertaking responsibility for Melody's care. The record reflects that Edwards was initially misdiagnosed as having a schizophrenic disorder. Because Dr. Chin, the Korean psychiatrist, concluded that her difficulties were created by the significant impact of the language and cultural barriers that confronted her, he affirmatively changed the diagnosis to adjustment disorder. Furthermore, the record contains repeated references to substantial difficulties that Edwards experienced in the spoken and written English language. Significantly, the psychologist who employed her in 1982 described her as illiterate and unfamiliar with spoken English. Although Dr. Bernet "didn't think [her language difficulty] was the main problem," his testimony does not provide the measure of proof sufficient to establish clearly and convincingly that her language deficiencies and cultural difference were not significant factors influencing his diagnosis. He related the diagnosis of thought disorder to observable deficiencies in both her language communication and her ability to provide satisfactory connections between her thoughts as expressed in the English language.

Furthermore, Dr. Bernet's testimony that he had no opinion as to the origin of Edwards' disorder supports the conclusion that the evidence is insufficient to discharge the department's burden of proof. This record contains no evidence from which we can conclude that Edwards has ever received treatment for hypothyroidism as recommended by Dr. Chin in 1981. Dr. Bernet's diagnosis did not take into account Edwards' hypothyroidism nor did his testimony refute the significance of Dr. Chin's earlier determination that Edwards did not have a schizophrenic disorder but needed treatment for hypothyroidism.

Additionally, we note that for an extended time period in 1984 and 1985 Edwards showed positive signs indicating an ability to care for Melody. She secured employment, had living arrangements satisfactory to the department, and evinced an ability to maintain a stable life style. The social services report of August 9, 1984 contains the following description.

Mrs. Edwards has done a fine job of stabilizing her living situation. She is no longer on medication and appears to be emotionally stable. Her love and caring for Melody has been consistent in that in the three years Melody has been in foster care, she has maintained constant contact with Melody and always requested visitation. This Worker's only concern is around Mrs. Edward's ability to manage Melody. Although her command of English is good (she will not use an interpreter) there are still things she does not understand; (i.e. she did not know the word "snack"). Melody is a very bright outgoing child who questions everything. This Worker will recommend supervision of this case once Melody is returned to her mother. Mrs. Edwards is a dependent person who seems to be able to get support from a variety of friends and neighbors.

It is this Worker's recommendation that Melody be sent home to live with her natural mother. This recommendation is based on the fact that her mother's situation is stable and she wants Melody with her. It is further recommended that custody of Melody remain with D.H.S. for the purposes of supervision of this case for at least six months.

When the social worker visited the home after four months, she reported that everything appeared fine. Melody lived successfully with Edwards for almost seven months. Furthermore, the circumstances under which Melody was removed from Edwards' custody in 1985, again suggest that the problems which confronted Edwards were related to cultural and language difficulties that escalated. This record gives little indication that Edwards has received the type of social service intervention that is designed to assist her in confronting the cultural and language barriers that play such a prominent role in her difficulties.

Termination of parental rights has often been upheld in cases where the parent has not made an effort to maintain contact with

the child or in cases where the parent has physically or emotionally abused the child. This case, however, shows no evidence of such conduct by Edwards. *Cf. Lowe*, 231 Va. at 279, 343 S.E.2d at 71 (upholding termination of residual parental rights of alcoholic mother who visited child only three times in the eight years the child was in foster care); *Deahl v. Winchester Department of Social Services*, 224 Va. 664, 299 S.E.2d 863 (1983) (countless incidents of parental abuse of the child); *Richardson v. Henry County Department of Social Services*, 223 Va. 670, 292 S.E.2d 342 (1982)(evidence of abuse discovered when child brought into hospital emergency room); *Toombs v. Lynchburg Division of Social Services*, 223 Va. 225, 231, 288 S.E.2d 405, 408 (1982)(where the record indicated that "the [parent-child] relationship deteriorated . . . due, in substantial part, to the infrequency with which the parents exercised their visitation rights"); *Banes*, 1 Va. App. at 466, 339 S.E.2d at 904 (residual parental rights terminated where parent exhibited "inactive interest" in child). Throughout the time Melody was in foster care, Edwards displayed a passionate interest in maintaining contact with her. She took full advantage of her visitation rights with Melody while she was in temporary and foster care. No evidence indicates that Melody was emotionally or physically abused. Moreover, the testimony established that with proper medication Edward's level of functioning would improve. These factors, when viewed in the aggregate, convey something less than a firm belief that Edwards' disorder was of a severity such that "there is no reasonable expectation that [she] will be able to undertake responsibility for the care needed by" Melody. Code § 16.1-283(B)(2)(a). Upon this evidence we conclude that there was no clear and convincing showing made of the statutory criteria required to support an order terminating residual parental rights.

■ By its nature, Code § 16.1-283 "contemplates the use, where possible, of alternatives less drastic than termination of parental rights." *Knox v. Lynchburg Division of Social Services*, 223 Va. 213, 223, 288 S.E.2d 399, 404 (1982). The record in this case demonstrates that remedial measures exist that are less harsh than terminating parental rights. Code § 16.1-279(A) provides several alternative remedies less drastic than the termination of parental rights.⁹ Those remedies, which merely effect "a transitory

⁹ Code § 16.1-279(A) provides:

change in the child's custodial status . . . without affecting other

If a child is found to be abused or neglected, or is at risk of being abused or neglected by a parent or custodian who has been adjudicated as having abused or neglected another child in the care of the parent or custodian, or is abandoned by his parent or other custodian or who by reason of the absence or physical or mental incapacity of his parents is without parental care and guardianship, the juvenile court or the circuit court, as the case may be, may make any of the following orders of disposition to protect the welfare of the child:

1. Enter an order pursuant to the provisions of § 16.1-278.

2. Permit the child to remain with his or her parent, guardian, legal custodian or other person standing in loco parentis subject to such conditions and limitations as the court may order with respect to such child, and his or her parent, guardian, legal custodian, other person standing in loco parentis or other adult occupant of the same dwelling.

2a. Prohibit or limit contact as the court deems appropriate between the child and his or her parent, guardian, legal custodian, other person standing in loco parentis or other adult occupant of the same dwelling whose presence tends to endanger the child's life, health or normal development. Such prohibition may include the exclusion of any such individual from the home under such conditions as the court may prescribe for a period to be determined by the court but in no event for longer than 180 days from the date of such determination. A hearing shall be held within 150 days to determine further disposition of the matter.

3. After a finding that there is no less drastic alternative, transfer legal custody subject to the provisions of § 16.1-281 to any of the following:

a. A relative or other individual who, after study, is found by the court to be qualified to receive and care for the child.

b. A child welfare agency, private organization or facility which is licensed or otherwise authorized by law to receive and provide care for such child; however, no court shall transfer legal custody of an abused or neglected child to an agency, organization or facility out of the Commonwealth without the approval of the Commissioner of Social Services.

c. The local board of public welfare or social services of the county or city in which the court has jurisdiction or, at the discretion of the court, to the local board of the county or city in which the child has residence if other than the county or city in which the court has jurisdiction, which board shall accept such child for care and custody. However, such local board, if one other than in the county or city in which the court has jurisdiction, shall not be required to accept such child until it has been given reasonable notice of the pendency of the case and an opportunity to be heard. Nothing herein shall be construed as prohibiting the commitment of a child to any local board of public welfare or social services in the Commonwealth when such local board consents to the commitment. The board to which the child is committed shall have the final authority to determine the appropriate placement for the child. Any order authorizing removal from the home and transferring legal custody of a child to a local board of public welfare or social services as provided in this subdivision shall be entered only upon a finding by the court whether reasonable efforts have been made to prevent removal and that continued placement in the home would be contrary to the welfare of the child, and the order shall so state.

parental rights," are specifically "designed for the case of a parent who shows extenuating circumstances and demonstrates [her] potential for rehabilitation as a fit parent." *Shank*, 217 Va. at 509, 230 S.E.2d at 456. The acute language barrier and the cultural isolation which Edwards faced serve to establish that hers was indeed a situation of extenuating circumstances. Her ability to maintain a stable environment for a substantial period of time and the prognosis of Dr. Bernet, indicating his belief that with appropriate medication her abilities would improve, demonstrate Edwards' potential for rehabilitation as a fit parent. The department, therefore, could have appropriately invoked one of the less radical remedies provided in § 16.1-279(A).

█ In addition to these statutorily created alternatives, the trial court may use its discretion to continue a case on its docket in order to allow further services to be rendered to a parent in the hope that termination of the parent's residual parental rights would not be necessary. *Knox*, 223 Va. at 222-223, 288 S.E.2d at 404. In light of the existence of these viable alternatives and under the circumstances of this case, the circuit court inappropriately terminated Edwards' residual parental rights.

Finally, Edwards contends that the trial court erred in denying her request for an advisory jury. The question whether "an issue out of chancery may be allowed" is committed to the sound discretion of the trial judge. Code § 16.1-296; *see also Crebs v. Jones*, 79 Va. 381, 385-86 (1884). The record does not reflect that the factual issues to be decided were necessarily more appropriate for a jury than for the judge. Accordingly, we conclude that the record does not demonstrate that the trial judge abused his discretion in denying the request for an advisory jury.

For the reasons stated, the order of the circuit court terminating Edwards' residual parental rights with respect to her daughter is reversed. The case is remanded, therefore, to the circuit court for further proceedings not inconsistent with this opinion.

4. Transfer legal custody pursuant to subdivision A 3 hereof and order the parent, guardian, legal custodian or other person standing in loco parentis to participate in such services and programs or to refrain from such conduct as the court may prescribe.

5. Terminate the rights of such parent, guardian, legal custodian or other person standing in loco parentis pursuant to § 16.1-283.

*Reversed and remanded.*

Duff, J., and Keenan, J., concurred.