COURT OF APPEALS OF VIRGINIA


Present:  Judges Benton, Coleman and Willis


DONNA FAYE SMITH

                                        MEMORANDUM OPINION[*]
v.    Record No. 0830-99-3                 PER CURIAM
                                        OCTOBER 5, 1999
ROANOKE CITY DEPARTMENT
 OF SOCIAL SERVICES


              FROM THE CIRCUIT COURT OF THE CITY OF ROANOKE
                      Jonathan M. Apgar, Judge

              (Joseph F. Vannoy, on brief).  Appellant
              submitting on brief.

              (William M. Hackworth, City Attorney;
              Allen T. Wilson, Assistant City Attorney, on
              brief).  Appellee submitting on brief.


     Donna Faye Smith (mother) appeals the decision of the circuit

court terminating her parental rights to two of her children,

"CWA" and "CSA."  Mother contends that the trial court erred by

(1) finding that Roanoke City Department of Social Services (DSS)

presented clear and convincing evidence sufficient to support

terminating her parental rights; and (2) finding that it was in

the children's best interests for mother's parental rights to be

terminated.  We conclude that this appeal is without merit.

Accordingly, we affirm the decision of the trial court.

     * Pursuant to Code § 17.1-413, recodifying Code
§ 17-116.010, this opinion is not designated for publication.

"When addressing matters concerning a child, including the termination of a parent's residual parental rights, the paramount consideration of a trial court is the child's best interests." Logan v. Fairfax County Dep't of Human Dev., 13 Va. App. 123, 128, 409 S.E.2d 460, 463 (1991).

> "In matters of a child's welfare, trial courts are vested with broad discretion in making the decisions necessary to guard and to foster a child's best interests." The trial court's judgment, "when based on evidence heard ore tenus, will not be disturbed on appeal unless plainly wrong or without evidence to support it."

Id. (citations omitted). "Code § 16.1-283 embodies 'the statutory scheme for the . . . termination of residual parental rights in this Commonwealth' [which] . . . 'provides detailed procedures designed to protect the rights of the parents and their child,' balancing their interests while seeking to preserve the family." Lecky v. Reed, 20 Va. App. 306, 311, 456 S.E.2d 538, 540 (1995) (citations omitted).

Former Code § 16.1-283(C)(2)[1], in effect at the time of this case, provided that a parent's residual parental rights to a child placed in foster care could be terminated if the trial court found it was in the best interests of the child and,

> [t]he parent or parents, without good cause, ha[d] been unwilling or unable within a reasonable period not to exceed twelve months to remedy substantially the conditions which led to the child's foster

---

[1] Code § 16.1-283 was re-written in 1998.

care placement, notwithstanding the reasonable and appropriate efforts of social, medical, mental health or other rehabilitative agencies to such end.

Proof that the parent, without good cause, failed or was unable to make reasonable progress toward the elimination of the conditions which led to the child's foster care placement in accordance with his or her obligations under and within the time limits set forth in a foster care plan filed with the court or a jointly designed foster care plan is prima facie evidence of the conditions set forth in Code § 16.1-283(C)(2).  See Former Code § 16.1-283(C)(3)(b) (recodified as Code § 16.1-283(C)(2)).

The children's father (father) contacted DSS on August 21, 1996 and claimed that he was unable to take care of CWA and CSA. Father requested that DSS take the children.  Before a DSS representative arrived at father's residence, mother took the children.

Sometime later, father again contacted DSS, stating that mother had returned the children to him, but that he did not have food or supplies for the children.  Kellie Flowers, of DSS, testified that she went to father's residence and saw that he had no food or furnishings for the children.  Mother had removed the food, furnishings, refrigerator and stove from father's residence. After Flowers spoke with mother, she returned the stove, refrigerator and some canned food to father's residence.

Mother advised Flowers that father had been abusive to her and the children. However, mother left the children in father's care. At a hearing held on October 31, 1996, the children were placed in the legal custody of DSS. At the hearing, both mother and father stated that they were financially unable to take care of the children. Flowers testified that she urged mother to go to a battered women's shelter so that she could keep the children together and with her, but mother refused to go. Flowers also advised mother that if she would work with Flowers, Flowers could help mother keep the children. Later, father died.

On February 19, 1999, a hearing was held concerning the termination of mother's parental rights. William Bailey, a foster care supervisor for DSS, testified that when the children were placed into foster care in the fall of 1996, mother received a copy of the foster care service plan, which listed the things mother needed to do in order to have her children returned to her care. DSS advised mother that she needed to find and maintain stable employment and adequate housing, visit the children, attend counseling, and keep DSS informed of any changes in her situation. On January 22, 1997, mother signed a contract with DSS, which listed the tasks that mother needed to complete in order to have the children returned to her.

Bailey stated that, initially, mother "showed signs of complying" with the contract. She started counseling, but then only attended two or three sessions. DSS advised her to take a

parenting class, but she did not complete the class. Mother was incarcerated for a probation violation for a period of time, and she did not maintain steady employment for more than a few months at a time. Although during the first year that the children were in foster care, mother regularly visited the children, she failed to comply with the other terms of the contract in order to have the children returned to her custody. Bailey testified that as time went on, it "became clear to" him that mother was "satisfied" to have other people care for the two children as long as she could visit the children. Bailey stated that DSS never considered returning the children to mother. Bailey also indicated that DSS sometimes had trouble reaching mother by telephone because she had no permanent residence after early 1997.

Bailey testified that both children had "well documented special needs" when they entered foster care. CWA was attending class for emotionally disturbed children. CSA had "delayed development," was in speech therapy, and "was basically non-verbal" when he entered foster care. Bailey stated that mother was aware of the children's special needs. Bailey testified that the "children are doing remarkably better than they were two years ago."

Mother was on probation and parole for a prior criminal conviction. Brent Keith, mother's probation and parole officer, testified that mother is required by the terms of her probation and parole to attend counseling for depression, family and

relationship issues.  Keith stated that mother had previously missed several of her counseling sessions, although in the months immediately preceding the hearing, she had been attending her sessions.  Keith also testified that mother is required to live with her aunt and grandmother until Keith believes it would be appropriate to live on her own.  Keith stated that because mother has not obtained and maintained employment, paid her court costs or court-ordered restitution, and has missed some of her counseling sessions, he did not believe that mother would qualify to live on her own.

On October 3, 1997, mother signed another contract with DSS, again acknowledging the tasks she needed to complete in order to have the children returned to her care.  Mary Beth Newton testified that during the fall of 1997, she was in charge of the children's case.  Newton said her biggest concern was mother's lack of steady employment.  Newton also stated that she had difficulty maintaining contact with mother because mother did not have a permanent residence.  In April, 1998, mother wrote a good-bye letter to the children, but Newton said that DSS would not allow the children to read the letter.  Newton also stated that mother attended counseling sessions "on and off" and attended many of the scheduled visits with the children.  Newton testified that the children tended to exhibit behavior problems after visiting with mother or when mother would cancel the visits at the last minute.  Furthermore, mother did not maintain stable

employment, and she did not obtain stable, independent, and appropriate housing for the children while Newton handled the children's case.

Eric Robinson was the foster care worker for the children from July, 1998 until the February 17, 1999 hearing date. Robinson stated that mother had missed a few visits with her children and had been late to some of the visits. Robinson also stated that DSS would not return the children to mother's care at that time.

Mother testified that she planned to continue counseling and she intended to find a job. She stated that since September, 1996, the longest time period in which she continuously held the same job was six weeks. The longest time period in which she had lived in one residence since September, 1996 was nine months. Mother still lived with her grandmother, but she stated that she had been renting a house that she did not live in, despite the fact that she was unemployed. She also admitted that she had not paid her court costs or restitution from her prior conviction.

Thus, the evidence proved that during the time period from the date the children were placed in foster care on October 31, 1996 until February, 1999, mother did not request unsupervised visits with her children, did not file for custody of the children, failed to maintain steady employment, and failed to obtain appropriate housing for the children. In short, during this time period, mother failed to progress toward having her

children returned to her care. Furthermore, the evidence proved that the children had special needs and were making improvements while in foster care. In addition, evidence was presented that the children tended to have behavior problems after visiting with their mother.

Therefore, although the record suggests that mother expressed good intentions over the years about having her children returned to her care, DSS presented clear and convincing evidence, including mother's own testimony about the instability of her lifestyle, that mother has been unable or unwilling within a reasonable period of time to substantially remedy the conditions which led to the foster care placement, despite the efforts of rehabilitative agencies. In addition, DSS presented clear and convincing evidence that it was in the best interests of the children to terminate the parental rights of mother. Accordingly, we cannot say that the findings of the trial court were plainly wrong or without evidence to support them.

For these reasons, we affirm the decision of the trial court.

Affirmed.

Benton, J., dissenting.

"The termination of parental rights is a grave, drastic and irreversible action." Lowe v. Department of Public Welfare, 231 Va. 277, 280, 343 S.E.2d 70, 72 (1986). An order terminating parental rights permanently severs the relationship between a child and her natural parent and "render[s] the parent a legal stranger to the child." Shank v. Department of Social Services, 217 Va. 506, 509, 230 S.E.2d 454, 457 (1976). Recognizing the harshness of a termination order, the Supreme Court has observed the following:

> Our prior decisions clearly indicate a respect for the natural bond between children and their natural parents. The preservation of the family, and in particular the parent-child relationship, is an important goal for not only the parents but also government itself. While it may be occasionally necessary to sever the legal relationship between parent and child, those circumstances are rare. Statutes terminating the legal relationship between parent and child should be interpreted consistently with the governmental objective of preserving, when possible, the parent-child relationship.

Weaver v. Roanoke Dept. of Human Res., 220 Va. 921, 926, 265 S.E.2d 692, 695 (1980).

As the majority notes, the record suggests that Donna Faye Smith had good intentions about having her children returned to her custody. No evidence proved that she ever neglected her children or had anything other than their best interests in mind. Although Smith sometimes made poor decisions, many of

- 9 -

those decisions were determined by her financial and emotional difficulties rather than ill will toward the children.  Further, evidence in the record established that she was trying to protect herself and the children from abuse by their father.  Apparently, Smith had been involved with the children's father since she was a pre-teen.  He physically and emotionally abused her over many years.  Smith suffered trauma from the abuse the children's father inflicted and from his death.  Smith also indicated she was a victim of childhood sexual abuse and was trying to address the problems associated with that abuse through counseling at Blue Ridge Community Services.

On June 11, 1998, thirteen months after the children's father's death, the Roanoke City Department of Social Services filed its petition to terminate Smith's rights.  The Department informed Smith that to secure the return of her children she needed to find stable employment, a suitable place to live, attend counseling, and visit the children.  Although Smith did not satisfy those requirements without complication, she substantially complied with the Department's instructions.  The record indicates that she showed signs of complying with the Department's requirements until the spring of 1997, when the children's father died and she was incarcerated for larceny.

By the following spring, however, Smith seemed to again be acting in good faith to comply with the Department's recommendations.  She maintained stable housing with her

grandmother from April of 1998 until the court date. The record also established that Smith, in an effort to regain custody of her children, had rented a three bedroom house and was current on the rent. However, she had been unable to occupy the house because her probation officer required her to live with her grandmother until she could pay her court costs and restitution and maintain regular employment. Smith was attempting to balance her probation officer's requirement that she live with family and the Department's requirement that she secure a home with enough bedrooms for each of the children. Smith testified she rented a house because her grandmother's house had only one extra bedroom and she needed to have a separate room for each of the two children.

With the exception of a few missed appointments, Smith visited her children regularly while they were in foster care. Although the Department concluded that at some point Smith seemed "satisfied" to have other people raise her two children as long as she could visit them, Smith indicated that she very much wanted to raise her children.

Although Smith did not attend the parenting class the Department suggested, she did attend parenting classes while incarcerated on a probation violation. Although the Department was concerned that Smith did not stay in the same job for more than six weeks at a time, Smith made an effort to stay employed in one job or another and was never fired from any of her jobs.

She quit voluntarily and always found other work.  She has even worked mowing lawns.  Additionally, as part of her probation, Smith is tested for drugs three times a week and has never had a positive test.

In short, the evidence in the record does not indicate that Smith ever abused her children.  The children were placed with social services because Smith and her deceased husband were financially unable to care for the children.  Smith continues to suffer a financial inability to provide for the children.  Moreover, the record fails to establish that Smith failed "without good cause" to remedy the conditions that led to the placement.

"By its nature, Code § 16.1-283 'contemplates the use, where possible, of alternatives less drastic than termination of parental rights.'"  Edwards v. County of Arlington, 5 Va. App. 294, 312, 361 S.E.2d 644, 654 (1987) (quoting Knox v. Lynchburg Div. of Social Servs., 223 Va. 213, 223, 288 S.E.2d 399, 404 (1982)).  I believe that the circumstances of this case suggest that an alternative less drastic than termination of parental rights was warranted.  Thus, I would reverse the order terminating Smith's parental rights.