COURT OF APPEALS OF VIRGINIA


Present:    Chief Judge Felton, Senior Judges Willis and Annunziata
Argued at Alexandria, Virginia


REENA SANGWAN, A/K/A
  MARY ELDRIDGE
                                                    MEMORANDUM OPINION[*] BY
v.        Record No. 0400-07-4                 JUDGE ROSEMARIE ANNUNZIATA
                                                       JANUARY 29, 2008
FAIRFAX COUNTY DEPARTMENT
  OF FAMILY SERVICES


                 FROM THE CIRCUIT COURT OF FAIRFAX COUNTY
                          Robert W. Wooldridge, Jr., Judge

            Michael S. Arif (Martin & Arif, on brief), for appellant.

            Deborah C. Laird, Assistant County Attorney (David P. Bobzien,
            County Attorney; Peter D. Andreoli, Jr., Deputy County Attorney;
            Dennis R. Bates, Senior Assistant County Attorney; Perry S. Garson,
            Guardian *ad litem* for minor child, on brief), for appellee.


        Reena Sangwan (mother) appeals a decision of the trial court terminating her residual

parental rights to her minor child, E.E.  Mother contends the trial court erred in finding that

(1) termination of her residual parental rights was in E.E.'s best interests under Code

§ 16.1-283(C)(2), where mother was consistently involved in E.E.'s life and where no evidence

showed that her continued parental rights would be detrimental to E.E.; and (2) she failed to

substantially remedy the situation that led to E.E.'s placement in foster care without good cause

under Code § 16.1-283(C)(2), where she faced substantial cultural barriers to caring for E.E. and

made significant progress in remedying her situation beyond the twelve-month period provided

in that code section.  Finding no error, we affirm.

_____

[*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

FACTS

On appeal, "[w]e view the evidence in the 'light most favorable' to the prevailing party in the circuit court and grant to that party the benefit of 'all reasonable inferences fairly deducible therefrom.'" Toms v. Hanover Dep't of Soc. Servs., 46 Va. App. 257, 262, 616 S.E.2d 765, 767 (2005) (quoting Logan v. Fairfax County Dep't of Human Dev., 13 Va. App. 123, 128, 409 S.E.2d 460, 463 (1991)).

E.E. was born on February 19, 2004 at Warren Memorial Hospital. Due to apparent health issues, he was transferred to Winchester Medical Center and then to the University of Virginia Medical Center (UVA Medical Center). Mother gave verbal consent for the transfer, but refused to authorize further medical procedures.

On February 23, 2004, Warren County Child Protective Services (WCPS) received information from UVA Medical Center that E.E. was in their care and that he had Downs Syndrome and a heart defect; the latter condition required surgery within six months. The hospital reported that mother was single and used the fictitious name, "Mary Eldridge," refusing to give her real name because she was afraid her family would learn of E.E.'s birth. According to a social worker at Winchester Medical Center, mother was so concerned by the circumstances of E.E.'s birth that she refused to sign the birth certificate and was suicidal. Mother did not have a place to live, any money, or a job when the UVA Medical Center was ready to discharge E.E. However, because E.E. was placed with one of mother's friends, Sharon Kubanda, WCPS did not intervene.

On July 9, 2004, WCPS received reports of mother's refusal to authorize necessary medical treatment for E.E. In addition, mother was not participating in E.E.'s medical appointments. The physician in charge of E.E.'s care reported that mother showed signs of

mental illness, possibly including paranoid schizophrenia. He expressed grave concern should mother not follow through with the required surgery for E.E.

On August 6, 2004, an affidavit in support of a neglect petition was filed in Warren County. A protective order was signed on September 10, 2004, ordering mother to comply with all medical treatments and appointments and to keep in touch with E.E.'s guardian *ad litem*.

During the proceedings in Warren County, mother gave temporary entrustment of E.E. to Fairfax County Department of Family Services (DFS). She later revoked the entrustment agreement on September 10, 2004, when E.E. was placed with Rocky and Delores Klemm, mother's friends.

On June 16, 2005, Fairfax County Children's Protective Services hotline received a report that the Klemms could not care for the child indefinitely. The Klemms, who had cared for E.E. for nine months, agreed to do so only until mother was able to find a job and a place to live. Mother had done neither.

As a result of the Klemms' call, Fairfax County social worker Colette Salgat visited the Klemms. Mother, who was present during Salgat's visit, refused to provide Salgat with her current residential address and admitted her illegal immigration and unemployment status. She also refused to give Salgat her real name, explaining that, in her culture, if her family learned that she had a child out of wedlock, she "would have to cleanse her family's name with blood."

In a subsequent meeting with Salgat, mother's personal issues and her legal status remained unchanged. Upon learning that Salgat intended to file documents in court relating to E.E, mother "became very agitated, hyper-verbal." Salgat called "Mobile Crises," who responded and evaluated mother. As a result, mother voluntarily admitted herself into Mount Vernon Hospital for mental health services to address her suicidal ideations and depression.

On July 7, 2005, DFS filed an emergency removal order with the Fairfax County Juvenile and Domestic Relations District Court (J & DR court). Salgat signed an accompanying affidavit that provided details in support of the claim that E.E. was an abused and neglected child and that his life or health would be subject to imminent threat were he to be returned to or left in mother's custody. DFS requested that E.E. be temporarily placed under its supervision pending a removal hearing set for July 14, 2005.

On July 14, 2005, the J & DR Court entered a preliminary removal order awarding temporary legal custody of E.E. to DFS, and providing supervised visitation to mother. Mother objected to the order through counsel, and the J & DR court set an adjudicatory hearing for August 12, 2005, and a dispositional hearing for September 30, 2005. The court also ordered DFS to file a foster care plan pursuant to Code § 16.1-281 by September 14, 2005, and ordered mother to undergo a psychological evaluation and to follow any and all treatment recommendations. A parent-child assessment was also ordered and mother was likewise directed to follow any and all treatment recommendations. The court also ordered mother to provide DFS with current contact information for herself, the child's father, and any relatives.

On August 12, 2005, the J & DR court entered a Dispositional Order for Abuse and Neglect Cases finding that E.E. was a neglected child under Code § 16.1-228(1). The order noted that mother had failed to identify a place to live or provide a telephone number where she could be reached. The order further noted that mother was unemployed, that she did not have the financial means to support E.E., and that she had not substantially planned for E.E.'s immediate or long-term future. The J & DR court set the dispositional hearing for September 30, 2005 and ordered DFS to file a Foster Care Service Plan by August 30, 2005.

On or about August 24, 2005, DFS filed a Foster Care Service Plan, which set forth the concurrent goals of "[r]eturn to own home" and "adoption," and a target date of August 31,

2006. The plan indicated that the Klemms were not in a position to care for E.E. indefinitely and that mother had refused the child's father's offer of help. The plan included the history of the case and noted that mother needed to secure legal status with the Department of Immigration and Naturalization (INS), find gainful employment, suitable housing and daycare, and complete psychological and parent-child evaluations. DFS agreed to assist mother with obtaining legal status, to refer her to appropriate housing resources, and to facilitate the psychological and parent-child evaluations.

On September 30, 2005, the J & DR court entered a Dispositional Order For Underlying Petition, Foster Care Plan. Mother and father were present for that hearing. The J & DR court continued custody of the child with DFS, finding that continued placement in the mother's home would be contrary to E.E.'s welfare. The court found that reasonable efforts had been made to prevent removal of the child from the home. The J & DR court approved the Foster Care Service Plan and allowed mother visitation at the discretion of DFS. It ordered DFS to continue to use reasonable efforts to assist mother, E.E., and the foster parents to accomplish the goals set forth in the Foster Care Service Plan.[1] A foster care review hearing was set for March 29, 2006.

On March 29, 2006, the J & DR court held the foster care review hearing. In its Foster Care Review Order, the J & DR court noted that reasonable efforts had been made to reunite E.E. with mother. It approved the new Foster Care Plan dated February 17, 2006, with its goal of "[r]eturn to own home." The court continued custody of E.E. with DFS and set a permanency planning hearing for July 14, 2006. The new Foster Care Plan noted that, although mother had consistently visited E.E., she requested less frequent visitation, explaining her plan to "bank" the time for later use when she could be with E.E. more. The Foster Care Plan further stated that none of the goals set out in the plan had been achieved. The plan described E.E. as "happy and

[1] The Klemms eventually became E.E.'s foster parents.

well cared for in his current placement . . . [that he was] regularly evaluated by the Infant and Toddler Connection of Virginia, . . . receive[d] multiple services through that agency . . . [and that he was] regularly monitored by his pediatrician and a geneticist."

On or about June 7, 2006, DFS filed another Foster Care Service Plan changing the goal to adoption with a concurrent goal of continued foster care. DFS noted the absence of progress toward the original goal of return home. The plan stated the following: DFS continued to work with mother, but no appreciable change occurred in the mother's progress toward the stated goals and her un-willingness to disclose any identifying, personal information to the Department continued. Mother did not have any visible means of support, stable housing, or legal immigration status, and she consistently refused to participate in the required evaluations. Mother's plans for E.E. were either to have an unnamed relative from India come to the United States to help her care for E.E., or, to return to India with E.E. and explain to her family that she had adopted a Downs Syndrome child.

At the same time, DFS noted that E.E. was thriving in his foster home and that all his needs were being met. The evidence indicated that the Klemms provided E.E. a very loving environment and that during mother's visitations with the child, E.E. showed little reaction to her.

On October 3, 2006, the J & DR court entered a permanency planning order approving the new Foster Care Service Plan and approving the permanent goal of adoption. The J & DR court granted DFS's separately filed petitions to terminate both mother's and father's residual parental rights as in the best interests of E.E. The J & DR court terminated mother's rights under Code § 16.1-283(C)(2), finding that, without good cause, she had been unwilling or unable within a reasonable time not to exceed twelve months from the date E.E. was placed in foster care to substantially remedy the conditions which led to or required continuation of his foster

care placement, notwithstanding the reasonable and appropriate efforts of social, medical, mental health or rehabilitative agencies. The J & DR court gave DFS authority to place E.E. for adoption. Mother appealed that decision to the circuit court.[2]

The testimony before the circuit court included the history of the case as outlined above, including, but not limited to, testimony regarding DFS's efforts to provide specific services to mother, mother's inadequate response to DFS's offer of services, mother's current illegal immigration status, and her continuing refusal to provide a home address or the means by which she could be contacted.

The circuit court also heard evidence of mother's mental condition through the testimony of Dr. Carolyn Murphy, a licensed clinical psychologist who administered psychological and parenting evaluations to mother on January 10, 2006. The test results showed that mother was extremely hesitant to reveal information about herself. Although the results did not suggest mother was grossly psychotic or highly disorganized in her thinking, many indications of idiosyncrasies in her thinking were evident, including paranoia and distorted perceptions, unusual trains of thought, and faulty judgment. Murphy opined that mother's ties to reality appeared to be attenuated at times, that she had some difficulty differentiating reality from fantasy, and that she was susceptible to going "off track into very loose thought associations." Murphy did not feel completely comfortable diagnosing mother due to the paranoid qualities she detected, but Murphy's tentative diagnosis was "either paranoid personality disorder, delusional disorder or potentially schizophrenia/paranoid type." Murphy opined that mother's prognosis for treatment was poor because mother did not believe she had psychiatric problems or that she needed treatment. Murphy opined within a reasonable degree of medical certainty that mother's ability to improve her mental condition without treatment was poor due to its chronic nature.

---

[2] Father did not appeal the J & DR court's decision.

According to Murphy, mother expressed a sense of responsibility and obligation towards E.E., but not much personal maternal attachment. Murphy did not experience any language barrier in communicating with mother. Indeed, mother told Murphy that she came from a large, close family in India, that she had obtained a Bachelor's degree in India, and then came to the United States to further her education. Mother earned a Bachelor's degree in International Studies at George Mason University. Mother also told Murphy that she eventually obtained employment as a live-in nanny and worked in that capacity for twelve to fifteen years.[3] According to Murphy, mother's plan for E.E. was to get a green card, obtain a job, and have E.E. live with her. If that plan proved unsuccessful, mother planned to try to get married in order to stay in the United States or take E.E. to India and have her sister care for the child, while mother remained in the United States to earn money to send to India for E.E.'s support.

Mother's cousin, Virenda Verma, testified in the circuit court hearing, and stated that he was willing to have mother and E.E. live with him in a two-room apartment he had leased in Louisa County. He also stated his willingness to provide support and health insurance for mother and E.E. At the time of the hearing, Verma had not yet taken occupancy of the apartment. A lease dated January 23, 2007, six days before the circuit court hearing and bearing Verma's signature and what he testified to be the alleged signature of the property manager, was admitted into evidence as Defendant's Exhibit 1, over DFS's objection.[4] It showed a limited lease term of only four months.

Verma testified that he earned about $3,000 per month, out of which he paid child support for his daughter in the amount of $313 per month and supported his mother who stays with him when she is in the United States. He could not produce a pay stub, explaining he is

_____

[3] Mother has been in the United States for twenty-five years.

[4] DFS objected on hearsay grounds as the property manager was not present to testify and the lease appeared to be a generic form.

paid in cash. He acknowledged that E.E. had medical problems and that he was aware of them, but he did not know, specifically, that E.E. had Downs Syndrome. He admitted he had never seen E.E. or visited him and also admitted a prior restraining order had issued against him arising out of a domestic dispute involving his ex-wife.

At the time of the hearing, mother continued with her refusal to disclose her current address and admitted she had no source of income to support E.E. Mother's immigration status was unchanged. She admitted DFS workers told her that she was required to attain certain goals within twelve months. She claimed she was unable to attain those goals within twelve months, because she did not get a green card, and because her father was still alive and she needed to tell him in person about E.E. Mother asserted that even though she has taken more than twelve months to comply with DFS's directives, it would be in E.E.'s best interest for her parental rights not to be terminated, because she "love[s] him more than [her own] life . . . ." She pointed out that if she had wanted to abandon him, she could have done so when he was born. Mother admitted E.E. had been in the care of others, essentially since his birth, but claimed it was "because of the circumstances – not because of [her] capabilities." She claimed because circumstances had changed, she was now "going to acknowledge to the world that [E.E.] is [her] son." Mother admitted she had been ordered to pay $65 per month in child support for E.E., but had not done so because she does not have a job and "it's been accumulating." Mother regularly visited E.E. while he was in the Klemms' care. However, mother told Delores Klemm that E.E. was not developing fast enough, and based on her conversations with mother, Mrs. Klemm believed mother was embarrassed by E.E.'s Downs Syndrome.

The trial court terminated mother's residual parental rights under Code § 16.1-283(C)(2), concluding that DFS had met its burden to show by clear and convincing evidence that mother has been unable or unwilling, within a reasonable time of foster care placement, not to exceed

twelve months, to substantially remedy the conditions that led to that placement and that her failure has been without good cause and despite the reasonable and appropriate efforts on the part of various agencies.

ANALYSIS

When considering termination of a parent's residual rights to a child, "the paramount consideration of a trial court is the child's best interests." Logan, 13 Va. App. at 128, 409 S.E.2d at 463. When the trial judge makes findings "'based on evidence heard *ore tenus*, [those findings] will not be disturbed on appeal unless plainly wrong or without evidence to support [them].'" Id. (quoting Peple v. Peple, 5 Va. App. 414, 422, 364 S.E.2d 232, 237 (1988)). On review, we will presume the trial judge "thoroughly weighed all the evidence, considered the statutory requirements, and made its determination based on the child's best interests." Farley v. Farley, 9 Va. App. 326, 329, 387 S.E.2d 794, 796 (1990). "In its capacity as factfinder, therefore, the circuit court retains 'broad discretion in making the decisions necessary to guard and to foster a child's best interests.'" Toms, 46 Va. App. at 266, 616 S.E.2d at 769 (quoting Farley, 9 Va. App. at 328, 387 S.E.2d at 795).

Code § 16.1-283(C)(2) provides that residual parental rights may be terminated if the judge finds by clear and convincing evidence that it is in the child's best interests and that the parent has been "unwilling or unable" to remedy substantially the conditions which led to the child's placement in foster care. Code § 16.1-283(C)(2) also requires proof that "reasonable and appropriate" services have been offered to help the parent "substantially remedy the conditions which led to or required continuation of the child's foster care placement" and that, despite these services, the parent has failed, "without good cause," to remedy those conditions "within a reasonable amount of time not to exceed twelve months from the date the child was placed in foster care."

I.

In reviewing the trial judge's determination of what is in the best interests of a child, we consider the following:

> [A] court must evaluate and consider many factors, including the age and physical and mental condition of the child or children; the age and physical and mental condition of the parents; the relationship existing between each parent and each child; the needs of the child or children; the role which each parent has played, and will play in the future, in the upbringing and care of the child or children; and such other factors as are necessary in determining the best interests of the child or children.

Barkey v. Commonwealth, Alexandria Dep't of Human Servs., 2 Va. App. 662, 668, 347 S.E.2d 188, 191 (1986).

Here, DFS proved that termination of mother's parental rights was in E.E.'s best interests. E.E. was almost three years old at the time of the termination hearing in the circuit court on January 30, 2007. He had not lived with mother for virtually his entire life. As of January 30, 2007, E.E. had been in foster care since September 2005, a period of approximately one and one-half years. Mother refused DFS's offers to assist her with obtaining legal immigration status and appropriate housing. Notwithstanding her expressed intent to obtain legal status herself and without assistance from DFS, mother made no progress in implementing her plan during the one and one-half-year period after the initial August 2005 foster care service plan was formulated. Indeed, mother has not obtained legal status during the twenty-five years she has lived in the United States. She consistently refused to reveal the address where she was living, preventing DFS from assisting her to obtain appropriate housing and from checking on the suitability of her housing.

Mother made no plans for E.E.'s future. She remained unemployed, and had no means of self-support or support for the child. Her cooperation in the effort to evaluate her psychological condition and her parenting skills was less than optimal. Since mother denied she had a

- 11 -

psychological problem and declined treatment, her diagnosed mental health conditions remained unaddressed. The psychologist who evaluated mother opined that her ability to successfully parent E.E., in light of those mental health issues, was questionable. Evidence showed that E.E. did not readily respond to mother and that mother was hesitant to have physical contact with him. Although mother asserted cultural reasons and her INS status as good cause for her failure to remedy the situation that led to E.E.'s foster care placement within twelve months, the fact finder was entitled to reject those reasons, and in light of the many other factors in this case, conclude that she failed to show good cause for the delay in remedying the situation. Cf. Edwards v. County of Arlington, 5 Va. App. 294, 314, 361 S.E.2d 644, 655 (1987) (circuit court's termination of mother's residual parental rights reversed where evidence showed mother, an uneducated Korean immigrant, who possessed great difficulty communicating in English and uncertain mental health diagnoses clouded by her communication and cultural barriers, demonstrated the ability to maintain a stable environment for her child over a substantial period of time and that with medication for her mental health condition, her abilities would improve). In summary, the evidence clearly supports the trial court's conclusion that termination of mother's parental rights was in E.E.'s best interests.

We find that the trial court did not err in finding clear and convincing evidence proved termination of mother's residual parental rights was in E.E.'s best interests.

II.

The record also establishes by clear and convincing evidence that mother demonstrated an unwillingness or inability to change the circumstances that necessitated E.E.'s placement in foster care within a reasonable amount of time, not to exceed twelve months. The initial Foster Care Service Plan dated August 17, 2005, with a target goal date of August 31, 2006, required mother to secure proper legal status with INS, find gainful employment, find suitable housing

and daycare, accept referrals to appropriate housing resources, complete psychological and parent-child evaluations, and follow through with any recommended treatment.  DFS agreed to provide services to assist mother with obtaining legal status, to refer her to appropriate housing resources, and to facilitate the psychological and parenting evaluations.

As discussed above, mother did not meet any of the stated goals with the exception of obtaining psychological and parenting evaluations, albeit with minimal cooperation.  In addition, although mother's cousin, Verma, came forward in December 2006, after the J & DR court terminated mother's rights and shortly before the hearing in the circuit court, to offer mother a place to live and support, the trial court concluded that arrangement was not workable.  Credible evidence supports that conclusion.  Verma had a prior protective order against him, he was not aware of E.E.'s precise health conditions, had never met E.E. or visited him, and had numerous other financial obligations, including providing child support and health insurance for his own child.  Verma did not produce a pay stub to substantiate his income.  Furthermore, the lease he produced at the hearing for the apartment where he planned to live with mother and E.E. only provided an initial term of four months, from February 1, 2007 through May 31, 2007.

"'The termination of [residual] parental rights is a grave, drastic and irreversible action.'" Helen W. v. Fairfax County Dep't of Human Dev., 12 Va. App. 877, 883, 407 S.E.2d 25, 28-28 (1991) (quoting Lowe v. Dep't of Public Welfare of Richmond, 231 Va. 277, 280, 343 S.E.2d 70, 72 (1986)).  However, "[i]t is clearly not in the best interests of a child to spend a lengthy period of time waiting to find out when, or even if, a parent will be capable of resuming his [or her] responsibilities." Kaywood v. Halifax County Dep't of Soc. Servs., 10 Va. App. 535, 540, 394 S.E.2d 492, 495 (1990).  We conclude that clear and convincing evidence proved that mother, without good cause, failed to substantially remedy the situation that led to E.E.'s placement in foster care in a reasonable period of time not to exceed twelve months.  Cf.

<u>Roanoke City Dep't of Soc. Servs. v. Heide</u>, 35 Va. App. 328, 337, 544 S.E.2d 890, 894 (2001) (held that "trial court may determine that a parent's delayed, but nonetheless substantial, progress may overcome the time delay" where the father completed in-patient substance abuse treatment, secured a job and worked for one year, and began to regularly attend AA meetings after the twelve-month period); <u>Edwards</u>, 5 Va. App. at 311-12, 361 S.E.2d at 653-54 (mother made substantial progress for an extended period of time by obtaining employment, establishing stable living arrangements, and taking full advantage of her visitation rights, even though she faced substantial difficulties with spoken and written English).

Accordingly, the trial court's decision terminating mother's residual parental rights to E.E. under Code § 16.1-283(C)(2) is affirmed. Clear and convincing evidence proved that termination was in E.E.'s best interests and that mother, without good cause, was unable or unwilling to substantially remedy the conditions that led to E.E.'s placement in foster care, within a reasonable time period not to exceed twelve months. Moreover, the evidence does not justify excusing mother's failure to remedy the situation within twelve months and allowing her more time to do so.

<u>Affirmed.</u>