## Salem

### JESSIE BELLE ROBINETTE

v.

### WAYNE KEENE AND SUSAN KEENE

No. 0830-85

Decided August 5, 1986

COUNSEL

C. Eugene Compton, for appellant.

Linda Tiller, for appellees.

OPINION

**BENTON, J.**—Jessie Belle Robinette, the natural mother of two girls, S_____, age 5, and J_____, age 2, appeals from a single order terminating her parental rights and granting the petitions for adoption of both children filed by Wayne and Susan Keene. The issue to be decided is whether the record establishes by clear, cogent, and convincing evidence that Robinette abandoned her children or is an unfit parent. We conclude that it does not and reverse the decision of the trial court.

Robinette learned on November 15, 1984, that her husband, Danny Robinette, had sexually molested S_____. The next day, Robinette and both children were taken by Ellen Anders, her husband's elderly aunt, to the Russell County Department of Social Services (the Department), where Robinette reported that her husband had sexually abused S_____. The Department arranged for S_____ to be examined at a hospital and referred Robinette to a spouse abuse center because she was afraid to return home. While S_____ was being examined Robinette went to Anders, who was keeping J_____ in the car, and asked if she would take J_____ home with her. Robinette testified that when they had left Anders' house earlier that day it was warm and J_____ was not wearing a coat. Robinette explained that she asked Anders to take J_____ home with her:

[b]ecause it was cold, and it was getting dark. Ellen [Anders] wanted to go on. I didn't know at the time where we were going or how long we had to be there. So I asked Ellen would she mind taking J_____ on with her, and she said she did not mind.

Robinette went to the spouse abuse center with S_____ that night. Her husband was charged with sexually abusing S_____.[1]

On November 22, Robinette and S_____ left the center and moved in with her sister on her father's farm. Robinette intended to occupy a trailer located on the farm after the tenants were evicted. Robinette testified that she did not contact Anders and did not regain custody of J_____ because she had no transportation, there was no telephone on the farm, and she was afraid that her husband, who had threatened to kill her, would learn where she was residing.

At an undisclosed date subsequent to his arrest for sexually abusing his child and prior to January 10, 1985, Danny Robinette sought to give his daughters to another family. He approached Kenneth Miller, a deputy sheriff, who testified:

It started through an arrest that was made. Then later on Danny Robinette came to my residence and asked if I knew of a place or some people that would like to have two children. I said I would like to have them myself, as far as that goes. Of course, I have four of my own. He said he wanted sombody to have them that doesn't have any children.

Miller then approached the Keenes, who attend the the deputy's church, about adopting the children:

Danny Robinette came to me, as I mentioned earlier, and he said he wanted those children to have a home. I didn't know whether they were interested in children. I knew they did not have any children.

---

[1] Danny Robinette entered a plea of guilty to a charge brought in connection with the sexual abuse of S_____.

* * *

I approached them about it. They were definitely inter-ested. I didn't make any arrangements.

* * *

It just came about in a line of conversation. It wasn't re-ally directed to them as an adoption or anything. It was men-tioned about the children and the status of them and that if there was any interest, there would be some action taken to-ward them, the plans of adoption for the children.

Robinette's husband executed an entrustment agreement for J_____ on January 10, 1985. On the same date the Department removed J_____ from Ellen Anders and placed the child in the foster care of persons unidentified in the record. J_____ was placed in the Keene's foster care on January 11. Catherine Sandefur, a social service worker, testified that the Department had received calls from persons, unidentified on this record, who complained that Anders was in ill health and could not care for the child. Although Anders was caring for a four-year old grand-daughter on a permanent basis when J_____ was removed from the home, Sandefur did not seek to remove the granddaughter from Anders' custody because she had "not received any concerns regarding the care of that child." Sandefur's concern in removing J_____ from Anders was not primarily related to improper care. She testified that:

[h]e [Danny Robinette] was the father and there were no restrictions on him at that time. He could go to the home and remove J_____ at any time. With the previous allega-tions [concerning] S_____ that was the major concern of the agency.

There was no direct testimony that Anders did not properly care for the younger child.

At 4:00 p.m. on January 10, after Robinette's husband had signed the entrustment agreement, Sandefur went to the farm where Robinette resided. Sandefur there learned that Robinette

had gone to a store with a female friend. S_____ was being cared for at that time by Robinette's uncle and another adult male. When Robinette did not return after Sandefur had made several visits to the farm that afternoon, Sandefur instructed Robinette's father to bring either Robinette or S_____ to the Department on January 11, 1985. Robinette testified that the car in which she was a passenger became disabled on a rural roadway on January 10 and she was unable to get to her father's farm until after 9 a.m. the following day. There was no telephone on the farm.

Robinette's father delivered S_____ to Sandefur at 9:00 a.m. on January 11. The juvenile and domestic relations district court that day entered an order of removal with respect to S_____. The girl was placed in the Keenes' foster care on the same date. The proceedings with respect to S_____ apparently were *ex parte* and pursuant to Code § 16.1-251.[2] The juvenile and domestic relations district court held a hearing on January 15, 1985, and apparently continued in effect the previous disposition of S_____ and J_____, that is, transfer of custody to the Department and their placement in the foster care of the Keenes; however, this record does not reflect the nature of that hearing or who was present. After the January 15 hearing, Robinette met with Sandefur and signed a temporary entrustment agreement for J_____.

Sherry Campbell, a foster-care worker with the Department, became involved in the case after Robinette's daughters had been placed in the Keenes' home. On March 11, 1985, Campbell prepared the foster-care plan required by Code § 16.1-281(A). A copy of the plan prepared for J_____, reproduced in the Keenes' brief, sets out the goal of "Return Home," and gives July, 1985 as the target date for achievement of this goal. The plan also indi-

---

[2] The record before us does not contain the record of proceedings in the juvenile and domestic relations district court. The transcript of proceedings in the circuit court indicates that the record was available in the circuit court. The trial court was advised by counsel for the Keenes that the juvenile and domestic relations district court did not terminate Robinette's residual parental rights and did not take further action beyond removal of J_____ from Anders' home and placement of both children in the Keenes' foster care.

No issue is raised as to the regularity of the proceedings in the juvenile and domestic relations district court. We note, however, that the absence of the record of proceedings in that court, an omission which is not confined to this case, hinders our full consideration of appeals involving parents and their children.

cates that the foster-care placement of the girls would be needed until "Robinette can provide a stable environment, provide adequate housing, improve parenting skills, and restrict people who demonstrate inappropriate behavior from the home."

Campbell testified that Robinette visited with S_____ and J_____ on January 23, March 5 and April 23, 1985 in the Department's offices. Between the first two dates Robinette did not request additional visits with the children. Between the second and third dates Robinette requested additional visits, but Campbell had "a tight schedule" and could not accommodate further visits.

On January 25, 1985, Danny Robinette executed in the juvenile and domestic relations district court his consent for the Keenes to adopt S_____ and J_____. The Keenes filed their petitions for adoption on February 4, 1985, alleging that Robinette abandoned the children and was an unfit mother. At the time the adoption petitions were filed, there was pending in the circuit court a divorce suit between Robinette and her husband in which Robinette sought custody of the children and an award of support for the children.[3]

In the adoption action the circuit court ordered the Department to undertake an investigation report pursuant to Code § 63.1-223. The Department's "home study" of Robinette reported that Robinette had obtained adequate housing and appeared "to be making sincere efforts in working with Social Services in order to have her children returned home." The report recommended that the girls remain in the Keenes' foster care "until Mrs. Robinette can establish a safe and secure home environment for her children, and also work with Social Services in preparing a positive environment for her children."

The trial judge heard the matter on April 1, 1985, but scheduled another hearing because of witness-related difficulties and because Robinette was not represented by counsel at the hearing. The trial judge again heard the matter on May 7, 1985, found that Robinette had abandoned both girls, found that she was an unfit mother, and terminated her parental rights. The trial judge also found that Robinette had withheld her consent to adoption

---

[3] Robinette's counsel represented at the oral argument of this appeal that the Robinettes are now divorced.

against the children's best interests and entered an interlocutory order of adoption. A panel of this court held that the interlocutory order was final as to Robinette and appealable. *See Shortridge* v. *Deel,* 224 Va. 589, 591-92, 299 S.E.2d 500, 502 (1983).

■ There is a strong presumption in controversies between a parent and third parties that the best interests of children will be served by placing them in the custody of the natural parent. *Patrick* v. *Byerley,* 228 Va. 691, 694, 325 S.E.2d 99, 101 (1985); *Judd* v. *Van Horn,* 195 Va. 988, 994, 81 S.E.2d 432, 435-36 (1954). In order·to deprive a parent of the custody of her children proof of unfitness of the parent must be shown by clear, cogent, and convincing evidence. *James* v. *James,* 230 Va. 51, 54, 334 S.E.2d 551, 553 (1985); *Szemler* v. *Clements,* 214 Va. 639, 644, 202 S.E.2d 880, 884 (1974). Parental unfitness may be established by proof of abandonment of a child without justification. *Patrick* v. *Byerley,* 228 Va. at 694, 325 S.E.2d at 101. We believe that the evidence falls far short of the standard of clear, cogent, and convincing proof that Robinette abandoned her children or that she is an unfit parent.

The evidence shows that Robinette, an impecunious person, sought assistance from the Russell County Social Service Department after her husband sexually abused S_____. While S_____ was undergoing a medical examination Robinette asked Anders, the elderly grandaunt of J_____, if she would take J_____ back to Anders' home. Anders had kept both girls on many previous occasions and had given Robinette and the girls shelter in her home for four months at an earlier time when Robinette had separated from her husband. There is no evidence that Robinette intended to give Anders permanent custody of J_____ or to abandon the child. The evidence shows that Robinette made the request of Anders because it was becoming cold and dark, because Robinette was unsure of her hospital wait and eventual destination, and because she trusted Anders with her child. Robinette subsequently called Anders from the spouse abuse center and asked her to keep the child "until she got some place to take her." There is nothing about the circumstances by which J_____ initially came to be in Anders' care which suggests abandonment.

Furthermore, the evidence clearly suggests reasons for the length of J_____'s stay with Anders. Robinette had caused her

husband to be charged and arrested in connection with sexual abuse of S————. She was hiding from him because he threatened to kill her, and she believed his threats. J———— was with a trusted person who had previously given Robinette and the children shelter for three to four months and who often kept the children for Robinette and her husband. Robinette testified that she requested the social service worker on two occasions to bring J———— to her and that her requests were denied because Robinette "didn't have her own place." The social service worker did not recall Robinette's request; however, Anders also testified that she had sought to contact Robinette through the Department and was told that Robinette's whereabouts could not be disclosed. We conclude that these circumstances do not establish by clear, cogent and convincing evidence that Robinette abandoned J————. The evidence does not show a renunciation or abdication of responsibility over the child by Robinette or a voluntary relinquishment of custody without justification. *See Wilkerson* v. *Wilkerson,* 214 Va. 395, 200 S.E.2d 581 (1973).

There is not a scintilla of evidence to support a finding that Robinette abandoned S————. When the social worker visited the farm, S———— was found in the care of an adult relative and another adult who lived on the farm. Although Robinette was not on the farm when the social worker visited and remained away from the farm that night, that evidence does not support a finding of abandonment. The evidence clearly established that Robinette lived on the farm with S————, that she provided for the child within her means, and that the child was being cared for by adult relatives during Robinette's short absence from the farm.

The trial court cited as evidence of Robinette's unfitness as a parent, the testimony of a witness that Robinette stated in January 1984 that she and her husband were planning to separate and that Robinette "was going to take the older child and give J———— to him, that she didn't want the baby." The record also contains the testimony of a nurse that she had difficulty arousing Robinette at 1:30 a.m. on July 29, 1984 "to calm" J————. Robinette was sleeping in the local hospital with J———— who had contracted pneumonia. There is evidence in the record relative to Robinette's parenting skills, including an incident in which Robinette punished one of the children by a slap on the face after the child had slapped an adult. Deputy Sheriff Miller testified that

Robinette "could have done a whole lot better than she did" as a mother. There is also conflicting evidence in the record regarding Robinette's housekeeping standards. However, we conclude that the evidence fails to establish that Robinette is an unfit parent.

Our holding that the evidence did not demonstrate abandonment or unfitness on Robinette's part removes the basis of the circuit court's action; however, we believe that a further discussion is warranted because this case involves more than a contest for custody of S———— and J————. The ultimate consequence of the Keenes' petitions, a final order of adoption, would have been the severance or termination of the legal relationship between Robinette and her children. Code § 63.1-233; *Doe* v. *Doe*, 222 Va. 736, 746-47, 284 S.E.2d 799, 805 (1981); *see Jolliff* v. *Crabtree*, 224 Va. 654, 656-58, 299 S.E.2d 358, 360 (1983); *Weaver* v. *Roanoke Department of Human Resources*, 220 Va. 921, 925-26 n.1, 265 S.E.2d 692, 694 n.1 (1980). The trial court took the view that abandonment or unfitness on the part of Robinette warranted termination of her parental rights in the adoption proceeding. As authority for this action the trial court cited *Patrick* v. *Byerley*, 228 Va. 691, 325 S.E.2d 99 (1985), and *Shortridge* v. *Deel*, 224 Va. 589, 299 S.E.2d 500 (1983).

The two cases relied upon by the trial court do not purport to authorize a termination of parental rights in an adoption proceeding upon a showing of parental abandonment or unfitness. In *Patrick* v. *Byerley*, a mother's abandonment of her infant son was sufficient to warrant several years later an award of *custody* to the boy's former stepmother. 228 Va. at 694-95, 325 S.E.2d at 101. In *Shortridge* v. *Deel*, a mother's voluntary relinquishment of custody of her infant son was sufficient to warrant retention of custody by third persons. 224 Va. at 594, 299 S.E.2d at 503-04. In neither case did the court terminate natural parent's residual parental rights. Indeed, the Supreme Court intimated in *Shortridge* that the mother could have regained custody by showing that such action would be in the child's best interests. 224 Va. at 594, 299 S.E.2d at 503 (citing *Szemler* v. *Clements*, 214 Va. 639, 644, 202 S.E.2d 880, 884 (1974) (natural parent who has lost custody must show regaining custody is in child's best interests)).

Code § 16.1-283 provides a statutory scheme for proceedings to terminate residual parental rights; moreover, we think the termination of parental rights often would bring untoward conse-

quences in the context of adoption proceedings. As the Supreme Court recognized with respect to adoption:

> Custody of children and child support are matters that remain within the breast of the court and are subject to change and modification so long as a child is a minor. This is not true of adoptions. Once an order of adoption becomes final, the natural parent is divested of all legal rights and obligations with respect to the child, and the child is free from all legal obligations of obedience and maintenance in respect to them. The child, to all intents and purposes, becomes the child of the person adopting him or her to the same extent as if the child had been born to the adopting parent in lawful wedlock.

*Doe* v. *Doe*, 222 Va. at 746-47, 284 S.E.2d at 805. A judicial termination of parental rights entails similarly profound consequences for a natural parent, rendering the parent in all respects a "legal stranger" to her child. *See Lowe* v. *Richmond Department of Public Welfare,* 231 Va. 277, 280, 343 S.E.2d 70, 72 (1986). Thus, the circuit court's termination of parental rights might have barred Robinette from interposing any objection to entry of a *final* order of adoption or contending that adoption by the Keenes was not in the best interests of S_____ and J_____. *See* Code § 63.1-227 (revocation of interlocutory order upon natural parent's motion); *Szemler* v. *Clements,* 214 Va. at 642-43, 202 S.E.2d at 884; *Shank* v. *Department of Social Services,* 217 Va. 506, 510-11, 230 S.E.2d 454, 457 (1976). Moreover, there is no evidence in the record that the Department's activities were directed toward adoption as the solution for the Robinette's difficulties. On the contrary, the March 29, 1985 "home study" of Robinette, prepared by the Department for the adoption case, provided:

> *SUMMARY:* Mrs. Robinette appears to be making sincere efforts in working with Social Services in order to have her children returned home. She has provided adequate housing and states she has been seeking employment. However, Mrs. Robinette will have to show she can maintain stability and security for her children and work on improving her parenting skills.

*RECOMMENDATION*: The Russell County Department of Social Services recommends that S⎯⎯⎯⎯ and J⎯⎯⎯⎯ remain in foster care until Mrs. Robinette can establish a safe and secure home environment for her children, and also work with Social Services in preparing a positive environment for her children.

At the time the Keenes filed their adoption petition, Robinette was endeavoring to regain custody of her children with the assistance of the Department. Robinette had cooperated with the Department and the Department was prepared to assist Robinette further to accomplish the goal of returning her children to her home. Robinette agreed to attend a parenting class at the suggestion of the Department; however, at the time of the circuit court hearing she had not attended any sessions because the classes had not commenced. Robinette has been deprived of her children for more than a year and is entitled, we believe, to an opportunity to demonstrate that she can succeed as a parent with the assistance provided by the Department.

A circuit court may grant a petition for adoption without a parent's consent if the court finds that consent "is withheld contrary to the best interests of the child." Code § 63.1-225(C). The order in this case contains such a finding. In *Malpass* v. *Morgan*, 213 Va. 393, 192 S.E.2d 794 (1972), the Supreme Court held that:

[w]here . . . there is no question of the fitness of the nonconsenting parent and he has not by conduct or previous legal action lost his rights to the child, it must be shown that continuance of the relationship between the two would be detrimental to the child's welfare.

*Id.* at 399, 192 S.E.2d at 799. Subsequent decisions have adhered to this rule. *See Jolliff* v. *Crabtree*, 224 Va. at 656-58, 299 S.E.2d at 359-60; *Doe* v. *Doe*, 222 Va. at 738-39, 284 S.E.2d at 805-06; *Cunningham* v. *Gray*, 221 Va. 792, 795-96, 273 S.E.2d 562, 563-64 (1981); *Ward* v. *Faw*, 219 Va. 1120, 1124-25, 253 S.E.2d 658, 661-62 (1979). These cases control our decision in this case.

The record indicates that S⎯⎯⎯⎯ and J⎯⎯⎯⎯ have received the Keenes' affection and attention. The record also shows that Robinette is working to restore normalcy to lives disrupted by her

husband's sexual abuse of S_____. We cannot say that continuance of Robinette's relationship with S_____ and J_____ would be detrimental to the girls' best interests.

Accordingly the judgment of the trial court terminating Robinette's parental rights and granting the petition for adoption is reversed. The case is remanded to the circuit court with instructions to dismiss the petitions and remand the case to the juvenile and domestic relations district court for proceedings in conformity with this opinion.

*Reversed and remanded.*

Coleman, J., and Moon, J., concurred.