COURT OF APPEALS OF VIRGINIA


Present:   Chief Judge Felton, Judges Elder and Petty
Argued at Salem, Virginia


LESLIE TODD

                                                        OPINION BY
v.       Record No. 0823-09-3               JUDGE WILLIAM G. PETTY
                                                   MARCH 9, 2010
LUCRETIA PUTNAM COPELAND


           FROM THE CIRCUIT COURT OF ROCKINGHAM COUNTY
                        Thomas J. Wilson, IV, Judge

           David A. Penrod (Grant D. Penrod; Hoover Penrod, PLC, on briefs),
           for appellant.

           Dana J. Cornett (David R. Martin, Guardian *ad litem* for the minor
           child; Miner, Martin & Mahn, PLC, on brief), for appellee.


       Appellant, Leslie Todd, is challenging the trial court's order terminating her parental rights

and allowing the adoption of her child without her consent, pursuant to Code §§ 63.2-1202(H),

-1203, and -1205.  Todd argues that the trial court erred in its interpretation of Code

§ 63.2-1202(H).  Copeland also challenges the constitutionality of Code § 63.2-1205 on due process

and equal protection grounds.[1]  For the reasons that follow, we agree with Todd, and reverse the

judgment of the trial court.

                                   I. BACKGROUND

       Leslie Todd gave birth to the child who is at the center of this case while Todd was

incarcerated.  Todd's relatives were not prepared to take her newborn baby, so she agreed that Linda

_____

       [1] Todd also challenges the sufficiency of the evidence to prove that the adoption was in
the child's best interest and the constitutionality of Code §§ 63.2-1203 and -1205 on equal
protection grounds.  Because we hold that the trial court misinterpreted Code § 63.2-1202(H) and
violated Todd's due process rights through its application of Code §§ 63.2-1203 and -1205, we
need not reach the issues of sufficiency of the evidence and equal protection.

Guenther, who served as a chaplain at the jail, and Guenther's friend, Lucretia Copeland, would take temporary custody of the baby until she could finish serving her sentence. Copeland and Guenther sought and received an order granting them temporary, indefinite custody of the baby. The order also granted Todd visitation with her baby at Copeland's and Guenther's discretion. Although both Copeland and Guenther cared for the baby during the first year, Copeland eventually became the baby's primary physical custodian.

Copeland brought the baby to visit Todd while she was incarcerated, usually on a weekly basis. After Todd's release in September 2003, the parties agreed that Todd could not take care of the child due to her housing and financial situation. However, she saw her child frequently through the summer of 2005. Beginning in July 2005, Todd's contact with the child began to wane, and from July 2006 through July 2007, Todd neither contacted nor visited with her child. While the record also indicates that Todd has been gainfully employed since her release from incarceration and has successfully completed her probation, Todd concedes that she cannot currently take custody of her child.

On July 21, 2007, Copeland contacted Todd and asked about adopting the child. That same day, Todd requested visitation with her child. Todd visited with her child that same day, and refused the adoption request. Following that visit, Todd asked that she be allowed to visit with the child more frequently. However, Copeland and Todd were not able to come to an agreement about visitation during the summer of 2007, and Todd eventually sought and received court-ordered visitation with her child. At Todd's request, the court appointed a mental health professional to assist with the development of a visitation plan and a relationship between Todd and her child.

Following the institution of the visitation order, Todd visited with her child on every occasion allowed by the court order. The mental health professional appointed by the court to assist in the visitation plan monitored the visits and reported that Todd and the child interacted well and

developed a close relationship, even though the child does not know that Todd is her biological mother. According to a report from the court-appointed mental health professional dated March 20, 2008, Todd and the child had progressed in their relationship to the point that the counselor believed that Todd should inform the child that she was her biological mother and that the two should have "unrestricted and unlimited" visitation. The report also stressed that: "From a developmental perspective, it would be detrimental for Ms. Todd and [the child] to terminate a mother/daughter relationship at this point."

On November 26, 2007, Copeland filed a petition to adopt the child. At the conclusion of the proceedings below, the trial court granted the petition on two separate grounds. The trial court held that Todd had failed to maintain contact with the child for a period of six months prior to the filing of the adoption petition as provided in Code § 63.2-1202(H) and, in the alternative, that Todd had withheld her consent contrary to the child's best interests as provided in Code §§ 63.2-1203 and -1205. This appeal followed.

## II. ANALYSIS

### A. Constitutionality of Code §§ 63.2-1203 and -1205

Todd argues that Code §§ 63.2-1203 and -1205, as applied in this proceeding, violated her constitutional right to due process. We agree and hold that the Fourteenth Amendment to the United States Constitution requires prospective adoptive parents to prove, by clear and convincing evidence, both that the entry of an adoption order over the objection of a nonconsenting parent is in the best interest of the child *and* that a continuing relationship with the birth parent would be detrimental to the child's welfare. Because the trial court did not make that determination here, it erred in granting the adoption.

1. Standard of Review

"[W]hen, as here, the constitutionality of a statute is challenged, our determination of legislative intent is guided by the recognition that 'all actions of the General Assembly are presumed to be constitutional.'" Virginia Soc'y for Human Life v. Caldwell, 256 Va. 151, 157, 500 S.E.2d 814, 816-17 (1998) (quoting Hess v. Snyder Hunt Corp., 240 Va. 49, 52, 392 S.E.2d 817, 820 (1990)). Accordingly, we will construe a statute "'in such a manner as to avoid a constitutional question wherever this is possible.'" Id. (quoting Eaton v. Davis, 176 Va. 330, 339, 10 S.E.2d 893, 897 (1940)); accord Jacobs v. Meade, 227 Va. 284, 287, 315 S.E.2d 383, 385 (1984).

We are also mindful that the termination of parental rights "is a grave, drastic and irreversible action," Helen W. v. Fairfax County Dep't of Human Dev., 12 Va. App. 877, 883, 407 S.E.2d 25, 28-29 (1991) (internal quotation marks and citation omitted), and that courts must apply a higher standard in determining whether adoption is appropriate, than would be applied in matters of custody or visitation. As our Supreme Court has noted,

> [t]he most drastic and far-reaching action that can be taken by a court of equity is to enter a final order of adoption. Such an order severing the ties between a parent and a child is as final, and often as devastating, as though the child had been delivered at birth to a stranger instead of into the arms of its natural mother or father.

Doe v. Doe, 222 Va. 736, 746, 284 S.E.2d 799, 805 (1981). In contrast, "[c]ustody of children and child support are matters that remain within the breast of the court" and are therefore subject to less stringent review. Robinette v. Keene, 2 Va. App. 578, 587, 347 S.E.2d 156, 161 (1986).

2. The Biological Parent's Fundamental Rights in the Adoption Context

The Fourteenth Amendment to the United States Constitution provides that no state shall "deprive any person of life, liberty, or property, without due process of law." The United States Supreme Court has recognized that a parent who has neither surrendered her rights to her child

nor had those rights terminated by a judicial proceeding has a liberty interest in the "nurture, upbringing, companionship, and custody" of her child that is protected by the Due Process Clause of the Fourteenth Amendment.  Troxel v. Granville, 530 U.S. 57, 77 (2000) (Souter, J., concurring); see also Quilloin v. Walcott, 434 U.S. 246, 255 (1978) ("We have little doubt that the Due Process Clause would be offended if a state were to attempt to force the breakup of a natural family, over the objections of the parents and their children, without some showing of unfitness and for the sole reason that to do so was thought to be in the children's best interest." (citation and internal quotation marks omitted)); Griffin v. Griffin, 41 Va. App. 77, 85, 581 S.E.2d 899, 903 (2003) ("Absent a showing of actual harm to the child, the constitutional liberty interests of fit parents take precedence over the best interests of the child." (citation and internal quotation marks omitted)).

By necessity, then, "an adoption case has two parts.  In the first, the natural parent's rights are severed."  Margaret F. Brinig, Virginia Domestic Relations Handbook § 7-2, at 58 (3d ed. 1996).  In most cases, that severance is voluntary, and is treated as a matter of contract.  Id.  When, however, as here, the biological parent protests the adoption, "the parent['s] rights are involuntarily terminated because of parental unfitness that cannot be remedied."  Id.  Because a biological parent has a fundamental right to raise her child, this involuntary termination of her parental rights involves significant substantive and procedural safeguards in order to protect the biological parent's due process rights.  See Armstrong v. Manzo, 380 U.S. 545 (1965); Weaver v. Roanoke Dep't of Human Res., 220 Va. 921, 926, 265 S.E.2d 692, 695 (1980).

These procedural safeguards are critical because

> [o]nce an order of adoption becomes final, the natural parent is
> divested of all legal rights and obligations with respect to the
> child . . . . The child, to all intents and purposes, becomes the child
> of the person adopting him or her to the same extent as if the child
> had been born to the adopting parent in lawful wedlock.

Doe, 222 Va. at 746-47, 284 S.E.2d at 805.  It is only after the court severs the biological parent's rights to the child in question that the court may address the "second step in the adoption proceeding"—"whether adoption by the prospective parents will be in the child's best interests." Brinig, supra, § 7-2, at 58.

### 3.  Virginia's Statutory Scheme and the Detriment to the Child Standard

#### Statutory History

The Code of Virginia has long provided a procedure by which a trial court may enter an adoption order in the absence of the biological parents' consent.  However, Virginia's appellate courts have always carefully interpreted that procedure in order to balance the best interests of the child in question and the Fourteenth Amendment rights of the biological parents.  While Virginia's policy has never been to leave children in the untenable situation of being at the mercy of a parent who is "obstinately self-willed in refusing to concur" to the adoption, Malpass v. Morgan, 213 Va. 393, 399, 192 S.E.2d 794, 798 (1972), we have required the prospective adoptive parent to prove not only that the adoption is in the child's best interests, but also "that continuance of the relationship between the [parent] and child would be detrimental to the child's welfare."  Jolliff v. Crabtree, 224 Va. 654, 657, 299 S.E.2d 358, 359 (1983) (citing Ward v. Faw, 219 Va. 1120, 1125, 253 S.E.2d 658, 661 (1979)).

Virginia courts developed the detriment to the child standard in order to balance these competing interests during a time in which the applicable adoption statute did not contain an "explicit standard."  Hickman v. Futty, 25 Va. App. 420, 426, 489 S.E.2d 232, 235 (1997) (collecting cases and explaining the relevant statutory history).  The statute applicable at that time, Code § 63.1-225(D), stated, in pertinent part:  "If after hearing evidence the court finds that the valid consent of any person or agency whose consent is hereinabove required is withheld

contrary to the best interests of the child or is unobtainable, the court may grant the petition without such consent[.]"  1995 Va. Acts, chs. 772, 826.

The General Assembly eventually codified the constitutional detriment to the child standard when it enacted Code § 63.1-225.1 in 1995.  1995 Va. Acts, chs. 772, 826.  Code § 63.1-225.1 required the court to consider not only the child's best interest, but also whether continuing the relationship between the biological parent and the child would be "detrimental to the child":

> In determining whether the valid consent of any person whose consent is required is withheld contrary to the best interests of the child, or is unobtainable, *the court shall consider whether the failure to grant the petition for adoption would be detrimental to the child.  In determining whether the failure to grant the petition would be detrimental to the child, the court shall consider* all relevant factors, including the birth parent(s)' efforts to obtain or maintain legal and physical custody of the child, whether the birth parent(s)' efforts to assert parental rights were thwarted by other people, the birth parent(s)' ability to care for the child, the age of the child, the quality of any previous relationship between the birth parent(s) and the child and between the birth parent(s) and any other minor children, the duration and suitability of the child's present custodial environment and the effect of a change of physical custody on the child.

1995 Va. Acts, chs. 772, 826 (emphasis added).[2]

In 2002, the General Assembly recodified Title 63.1 of the Virginia Code.  2002 Va. Acts, ch. 747.  Former Code § 63.1-225, recodified at § 63.2-1203, continued to give a trial court the authority to grant an adoption petition without the biological parents' consent if it determined that the consent was "withheld contrary to the best interests of the child as set forth in

---

[2] In 2000, the General Assembly rearranged the adoption statutes, repealing Code §§ 63.1-225 and -225.1 and recodifying them at § 63.1-219.11 and -219.23, respectively.  The only change in the "detriment to the child" statute at that time was a non-substantive one.  Compare 1995 Va. Acts, chs. 772, 826 with 2000 Va. Acts, ch. 830 (indicating change in language of first sentence of former Code § 63.1-225.1 from "the petition for adoption" to "the petition pending before it"); see also Gooch v. Harris, 52 Va. App. 157, 161 & n.2, 662 S.E.2d 95, 97 & n.2 (2008) (tracing the evolution of these statutes).

§ 63.2-1205." Former Code § 63.1-225.1, as recodified at § 63.2-1205 in 2002, retained the language requiring a finding of detriment to the child in order to permit adoption over a parent's withholding of consent. 2002 Va. Acts, ch. 747. The only change made by the General Assembly at the time of recodification, other than minor adjustments in punctuation, was the insertion of "juvenile and domestic relations district" prior to the word "court" in the highlighted portion of the statute.[3] A year later the General Assembly added language so that the standard contained in Code § 63.2-1205 applied to determinations made not only by juvenile courts but also by circuit courts.

In 2006, four years after the recodification of Title 63.1 as Title 63.2, the General Assembly amended Code § 63.2-1205 to remove the language requiring a finding of detriment to the child in order to permit adoption without parental consent. 2006 Va. Acts, chs. 825, 848; see Gooch v. Harris, 52 Va. App. 157, 161-62 & n.5, 662 S.E.2d 95, 97 & n.5 (2008) (holding that "Code § 63.2-1205 no longer requires any specific finding that failure to grant the adoption

---

[3] That version of Code § 63.2-1205 provided as follows:

> In determining whether the valid consent of any person whose consent is required is withheld contrary to the best interests of the child, or is unobtainable, *the juvenile and domestic relations district court shall consider whether the failure to grant the petition pending before it would be detrimental to the child. In determining whether the failure to grant the petition would be detrimental to the child, the juvenile and domestic relations district court shall consider* all relevant factors, including the birth parent(s)' efforts to obtain or maintain legal and physical custody of the child; whether the birth parent(s)' efforts to assert parental rights were thwarted by other people; the birth parent(s)' ability to care for the child; the age of the child; the quality of any previous relationship between the birth parent(s) and the child and between the birth parent(s) and any other minor children; the duration and suitability of the child's present custodial environment; and the effect of a change of physical custody on the child.

2002 Va. Acts, ch. 747 (emphasis added).

petition would be detrimental to the child" but declining to reach the constitutional issue because it was not raised by the parties); see also T.S.G. v. B.A.S., 52 Va. App. 583, 597 & n.12, 665 S.E.2d 854, 861 & n.12 (2008) (same). As set out in the Acts of Assembly, that amendment made the following additions (indicated by italicized text), and deletions (indicated by strikethrough text):

> In determining whether the valid consent of any person whose consent is required is withheld contrary to the best interests of the child, or is unobtainable, the circuit court or juvenile and domestic relations district court, as the case may be, shall consider whether ~~the failure to grant~~ *granting* the petition pending before it would be ~~detrimental to~~ *in the best interests of* the child. ~~In determining whether the failure to grant the petition would be detrimental to the child, the~~ *The* circuit court or juvenile and domestic relations district court, as the case may be, shall consider all relevant factors, including the birth parent(s)' efforts to obtain or maintain legal and physical custody of the child; *whether the birth parent(s) are currently willing and able to assume full custody of the child*; whether the birth parent(s)' efforts to assert parental rights were thwarted by other people; the birth parent(s)' ability to care for the child; the age of the child; the quality of any previous relationship between the birth parent(s) and the child and between the birth parent(s) and any other minor children; the duration and suitability of the child's present custodial environment; and the effect of a change of physical custody on the child.

2006 Va. Acts, ch. 848.

Thus, the General Assembly retained the factors required to be considered to determine whether the failure to grant the petition for adoption would be detrimental to the child. However, instead of requiring the consideration of those factors to determine *detriment*, Code § 63.2-1205, read in conjunction with Code § 63.2-1203, lists them simply as factors relevant to determining whether "any person or agency whose consent is required is withheld contrary to the *best interests* of the child." Code § 63.2-1203 (emphasis added). Once again, just like before the enactment of Code § 63.1-225.1 in 1995, the relevant statutes make no mention of the

constitutional standard requiring proof of detriment to the child in order to override a lack of parental consent for adoption.[4]

### The Detriment to the Child Standard Exists Independently of the Virginia Code to Protect the Constitutional Rights of Biological Parents

Since the Virginia Supreme Court decided Malpass in 1972, Virginia courts have emphasized that there must be more than a mere finding that granting an adoption over the parent's objection would be in the child's best interests. Malpass, 213 Va. at 393, 192 S.E.2d at 794. The rationale for this rule is clear: were "the suitability of placement in the prospective adoptive home . . . alone sufficient to warrant a finding that consent to the adoption was being withheld contrary to the child's best interests . . . the consent requirement of the adoption statute would be meaningless." Hickman, 25 Va. App. at 427, 489 S.E.2d at 235. If the best interest of the child were the sole consideration in granting an adoption, "the court could forever divest a natural parent of all rights and obligations with respect to the child, simply by finding placement

---

[4] Present Code § 63.2-1205 states:

> The circuit court or juvenile and domestic relations district court, as the case may be, shall consider all relevant factors, including the birth parent(s)'efforts to obtain or maintain legal and physical custody of the child; whether the birth parent(s) are currently willing and able to assume full custody of the child; whether the birth parent(s)'efforts to assert parental rights were thwarted by other people; the birth parent(s)' ability to care for the child; the age of the child; the quality of any previous relationship between the birth parent(s) and the child and between the birth parent(s) and any other minor children; the duration and suitability of the child's present custodial environment; and the effect of a change of physical custody on the child.

2006 Va. Acts, chs. 825, 848. The 2006 revision of Virginia's adoption statutes was preceded by a joint House and Senate Study group. Although the study group produced summaries of its meetings, see SJR 331: Study of Virginia's Adoption Laws and Policies, available at http://dls.state.va.us/adoption.htm, these summaries do not provide any information pertinent to the revised wording of Code § 63.2-1205.

in the prospective adoptive home more suitable to the child than placement with the child's birth parent." Id.

Instead, the best interest language of Code §§ 63.2-1203 and -1205—like the best interest language in earlier incarnations of the same statute—must be read in light of the biological parent's right to her child. In Ward,[5] for instance, our Supreme Court reversed the trial court's order granting the stepfather's adoption petition over the father's protest. 219 Va. at 1125, 253 S.E.2d at 662. There, the trial court found that the adoption was in the child's best interests because the child was "very affectionate towards his stepfather," the child's mother and stepfather provided him with a loving and stable home, and, although he had sent birthday and Christmas presents and regularly supported the child, the father had not visited his son for three-and-one-half years prior to the hearing. Id. at 1122, 253 S.E.2d at 660. As a result, the trial court found that "the boy did not know his natural father; . . . Ward was 'a complete stranger' to his son." Id. The trial court also reasoned that "[t]o deny the adoption and take the child from a stable and happy environment and expose him to the natural father through his visitation rights would be in essence for the Court to experiment with the future welfare of the child." Id. at 1123, 253 S.E.2d at 661.

Despite these factual findings, the Supreme Court reversed. The Court, relying on its earlier decision in Malpass, 213 Va. at 393, 192 S.E.2d at 794, concluded that "when 'there is no question of the fitness of the non-consenting parent and he has not by conduct or previous legal action lost his rights to the child, it must be shown that continuance of the relationship between the two would be detrimental to the child's welfare.'" Ward, 219 Va. at 1124, 253 S.E.2d at 661

---

[5] Ward was decided under former Code § 63.1-225(4), which provided in pertinent part that, "if the trial court finds after hearing evidence that the father's consent is withheld contrary to the best interests of the child, the court may grant the [adoption] petition without such consent." Ward, 219 Va. at 1123, 253 S.E.2d at 660.

(quoting Malpass, 213 Va. at 399, 192 S.E.2d at 799). In Ward there was "no finding that the natural father [was] an unfit parent." Id. Thus, "the burden was on the adoptive parent to establish by the evidence that continuation of the relationship between the father and the child would be detrimental to the child's welfare." Id. at 1125, 253 S.E.2d at 661. There, the adoptive parent failed to carry the burden. Id. at 1125, 253 S.E.2d at 662.

Moreover, even in cases in which a parent is not fit, "the unfitness of the parent" does not, in and of itself, justify the entry of an adoption order over the biological parent's objection. Hickman, 25 Va. App. at 428, 489 S.E.2d at 236. Instead, the unfitness must be so severe and so incapable of remedy that "the continuance of the relationship" between the biological parent and the child would be "detrimental to the child's welfare." Id.

In Doe, 222 Va. at 745-46, 284 S.E.2d at 805-06,[6] our Supreme Court reversed a stepmother's adoption petition that relied solely on the father and stepmother's argument that the mother should not have parental rights to her biological son because she was a lesbian. The Court, assuming *arguendo* that the mother's lifestyle rendered her an unfit parent, concluded that unfitness alone was not enough to permanently sever a biological parent's rights to her child: "If Jane Doe is an unfit parent, it is solely her lesbian relationship which renders her unfit, and this must be to such an extent as to make the continuance of the parent-child relationship heretofore existing between her and her son detrimental to the child's welfare." Id. at 746, 284 S.E.2d at 805.

The Court concluded that, because the petitioners had presented no evidence that a continued relationship with the mother would be detrimental to the child's welfare, the trial court

---

[6] Doe was decided under former Code § 63.1-225(C), which provided in pertinent part: "If after hearing evidence the court finds that the valid consent of any person . . . whose consent is hereinabove required is withheld contrary to the best interests of the child . . . the court may grant the petition without such consent."

erred when it granted the petition for adoption. Thus, in order to grant a petition for adoption over the biological parent's objection, courts must look beyond the biological parent's unfitness to have custody of a child, and "determine whether the consequences of harm to the child of allowing the parent-child relationship to continue are more severe than the consequences of its termination." Id. at 747, 284 S.E.2d at 805: accord Lyle v. Eskridge, 14 Va. App. 874, 877 n.1, 419 S.E.2d 863, 865 n.1 (1992) ("There may be situations where a parent may be deemed unfit and, yet, continuance of the relationship will not be detrimental to the child.").

This recognition that the detriment to the child standard is necessary to protect the due process rights of nonconsenting biological parents is consistent with other decisions involving the rights of parents and the protection of children. For instance, the Supreme Court of Virginia held that the constitutionally protected rights of biological parents can only be overcome by a showing of actual harm, or detriment to a child's well-being, in Williams v. Williams, 256 Va. 19, 501 S.E.2d 417 (1998) (plurality op.). There, the Court addressed the parents' appeal of an order allowing the child's paternal grandparents visitation based on Code § 20-124.2(B).[7] On appeal, the parents argued that the order infringed upon their right to "autonomy in child rearing and, hence, violated the Fourteenth Amendment to the United States Constitution." Id. at 21, 501 S.E.2d at 417.

Our Supreme Court agreed with the parents and reversed the trial court's order. Adopting the reasoning of this Court, our Supreme Court held that "state interference with a fundamental right must be justified by a compelling state interest, and that to constitute a compelling interest, state interference with a parent's right to raise [her] child must be for the

---

[7] Code § 20-124.2(B) allows "persons with a legitimate interest" to seek custody of or visitation with a child "upon a showing by clear and convincing evidence that the best interest of the child would be served thereby." The statute also instructs the court to "give due regard to the primacy of the parent-child relationship" in making its custody or visitation decision. Id.

purpose of protecting the child's health or welfare." Id. at 21, 501 S.E.2d at 418. Thus, the

Court reasoned that a non-parent must prove—in addition to establishing the visitation is in the

best interests of the child—that "denial of non-parent visitation would be detrimental to the

child's welfare before the court [could] interfere with the constitutionally protected parental

rights." Id. at 22, 501 S.E.2d at 418; see also Griffin, 41 Va. App. at 83, 581 S.E.2d at 902

(holding that in a "dispute between a fit parent and a non-parent," the best interests test should be

applied only if the trial court first finds "an actual harm to the child's health or welfare without"

visitation with the non-parent).

    As these cases illustrate, the detriment to the child standard exists independent of the

Virginia Code to protect the parental rights of biological parents—rights that the United States

Supreme Court has recognized are protected by the Fourteenth Amendment to the United States

Constitution. See, e.g., Troxel, 530 U.S. at 57. [8] Thus, we conclude that a trial court must make

a detriment to the child determination, regardless of the language of the relevant statute, before

---

[8] Finally, we note that this conclusion is consistent with the Code's treatment of children who are in the care of social services. In order to terminate the parental rights of a biological parent under Title 16.1 of the Code of Virginia, the party seeking termination must prove more than the termination would be in the child's best interests. Code § 16.1-283, which governs the termination of residual parental rights of parents whose children have been placed in foster care, requires more than a finding that the termination will be in the best interest of the child. Instead, the statute sets forth several other required findings *in addition* to a determination that the termination would be in the child's best interests in order to justify a termination of parental rights. See Code § 16.1-283(B) (requiring a finding that the child suffered serious abuse or neglect the causes for which are unlikely to be remedied within a reasonable time); Code § 16.1-283(C)(1) (requiring a finding that the parents "have, without good cause failed to maintain contact with and to provide or substantially plan for the future of the child for a period of six months after the child's placement in foster care" despite support from social services); Code § 16.1-283(C)(2) (requiring a finding that the parents are "unwilling or unable . . . to remedy substantially the conditions which led to or required continuation of the child's foster care placement, notwithstanding" the efforts of various agencies and professionals); Code § 16.1-283(D) (requiring a finding that the child was abandoned, the identity of the parents cannot be ascertained, and no parents, relatives or guardian has claimed the child); Code § 16.1-283(E) (requiring a finding that the parent's residual parental rights to a sibling of the child have been terminated, the parent has been convicted of any of several statutorily enumerated crimes, or the parent has "subjected any child to aggravated circumstances").

entering an adoption order, in order to protect the Fourteenth Amendment rights of a nonconsenting biological parent.

Before 1995, Virginia's adoption statutes, as interpreted by Virginia's appellate courts, passed constitutional muster despite the absence of an explicit standard because the courts read into the statute the requirement that "[a]n adoption over objection by a natural parent should not be granted except upon clear and convincing evidence that the adoption would be in a child's best interest *and* that it would be detrimental to continue the natural parent-child relationship." Lyle, 14 Va. App. at 876, 419 S.E.2d at 865 (emphasis added) (citing Frye v. Spotte, 4 Va. App. 530, 532, 359 S.E.2d 315, 317 (1987)). We must now address what effect, if any, the General Assembly's 2006 amendment of Code § 63.2-1205 has on the applicability of the detriment to the child standard.

<u>Legislative Intent</u>

Having reviewed the statutory history of Code §§ 63.2-1203 and -1205 and determined that the detriment to the child standard is a constitutional, not statutory, requirement, we reach the underlying issue in this case: Whether the General Assembly intended trial courts to abandon the detriment to the child standard when applying Code §§ 63.2-1203 and -1205. We conclude that it did not.

In making this determination, we are guided by several principles of statutory construction. We initially note that "a presumption normally arises that a change in law was intended when new provisions are added to prior legislation by an amendatory act" or "existing rights" are "withdraw[n] . . . [from an] act." Boyd v. Commonwealth, 216 Va. 16, 20, 215 S.E.2d 915, 918 (1975) (per curiam). We also, however, have a duty to construe statutes subject to a constitutional challenge in a manner that "avoid[s] any conflict with the Constitution." Commonwealth v. Doe, 278 Va. 223, 229, 682 S.E.2d 906, 908 (2009) (citations omitted).

- 15 -

Accordingly, where, as here we are faced with the construction of a statute involving constitutional implications, "[w]e attribute to the legislature the intent to enact laws that conform to the [C]onstitution in all respects." Kopalchick v. Catholic Diocese of Richmond, 274 Va. 332, 340, 645 S.E.2d 439, 443 (2007). Thus, we "[i]ndulg[e] every possible presumption in favor of the validity of the statute now under consideration," Young v. Commonwealth, 101 Va. 853, 870, 45 S.E. 327, 331 (1903), and, "whenever possible, . . . interpret statutory language in a matter that avoids a constitutional question," Doe, 278 Va. at 229, 682 S.E.2d at 908. A statute cannot "be declared to be unconstitutional unless it is plainly and clearly so. If any reasonable doubt exists as to its constitutionality, the act will be upheld. To doubt is to affirm." City of Roanoke v. Elliott, 123 Va. 393, 406, 96 S.E. 819, 824 (1918).

Thus, while we recognize that the General Assembly removed the detriment to the child language from Code § 63.2-1205 in 2006, that recognition does not, however, lead us to hold that the General Assembly intended that courts no longer make a detriment to the child determination. Because the detriment to the child standard is necessary to protect the due process rights of nonconsenting biological parents, a conclusion that the General Assembly intended to abandon that standard would lead us to deduce that Code §§ 63.2-1203 and -1205 facially violate the Fourteenth Amendment.

Given that the standard is constitutionally necessary, we are confident that the General Assembly had no intention of rendering Code §§ 63.2-1203 and -1205 unconstitutional when it removed the "detriment to the child" language. Instead, we conclude that the General Assembly removed this phrase because it was aware of our prior decisions and the constitutional import of the detriment to the child determination, and believed that including the detriment to the child language—which referenced a long-standing constitutional standard that existed independent of the statute itself—was mere surplusage. See Weathers v. Commonwealth, 262 Va. 803, 805, 553

- 16 -

S.E.2d 729, 730 (2001) (holding that principles of statutory construction require us to presume, in the absence of explicit evidence to the contrary, that the legislature is familiar with the decisions of our appellate courts and that it acquiesces therein when it takes legislative action).

Despite the deletion of this language from the Code, we conclude that the Fourteenth Amendment of the United States Constitution still requires that judges consider whether a continued relationship with his or her biological parent would be detrimental to a child's well-being. Because this requirement continues to exist, a trial court must make that finding before entering an adoption order over the objection of a nonconsenting parent. Here, the trial court did not make the detriment to the child determination; thus, its application of Code §§ 63.2-1203 and -1205 in this case violated Todd's Fourteenth Amendment right to due process.[9]

## B. Interpretation of Code § 63.2-1202(H)

Our analysis does not end with our determination that the trial court's application of Code §§ 63.2-1203 and -1205 violated Todd's due process rights. Because the trial court announced alternative grounds for its holding, we must also address Todd's challenge to the trial court's interpretation of Code § 63.2-1202(H). Because we hold that the plain language of Code § 63.2-1202(H) refers to the six months immediately preceding the filing of the adoption petition, we reverse on this issue as well.

Statutory interpretation is a question of law which we review *de novo*, and we determine the legislative intent from the words the General Assembly used in the statute. Washington v. Commonwealth, 272 Va. 449, 455, 634 S.E.2d 310, 313-14 (2006).

---

[9] In this case, we need not attempt to define the term "detriment to the child." We do note, however, that none of the trial court's findings rise to the level of detriment required by prior appellate decisions or analogous statutes under Title 16.1 of the Code of Virginia.

- 17 -

Code § 63.2-1202(H) states that an adoption may proceed without a birth parent's consent when the prospective adoptive parent proves by clear and convincing evidence that the biological parent has failed, without just cause, to visit or contact "the child for a period of six months prior to the filing of the adoption petition." The parties dispute whether the statutory language "prior to" refers to a period *immediately* prior to the filing of the petition, or to *any* period prior to the filing of the petition. Todd argues that the phrase "prior to" refers to the six months immediately preceding the filing of the adoption petition, whereas Copeland argues, and the trial court determined, that the phrase refers to any six-month period of abandonment that occurred at any time before the filing of the petition. Accordingly, the trial court held that Todd's failure to visit her child from July 2006 through July 2007 satisfied the terms of the statute.

In determining the plain meaning of statutory language, "legislative purpose is expressed by the ordinary meaning of the words used." Ardestani v. INS, 502 U.S. 129, 136 (1991). However, the phrase "prior to" simply means "before," Bryan A. Garner, A Dictionary of Modern English Usage 692 (2d ed. 1995), which does not aid in determining whether the General Assembly intended that the relevant time period be that immediately before the filing of the petition, or any time period before the filing.

However, the fact that the General Assembly chose to tie the six-month period to a date certain—the filing of the adoption petition—does aid our analysis. See United States v. Locke, 471 U.S. 84, 95 (1985) (construing a statutory filing deadline of "prior to December 31" to mean "on or before December 30"— the time immediately preceding the date certain). In this context, the filing of the adoption petition is a condition that must exist before the circuit court has jurisdiction over the adoption proceeding. See Code § 63.2-1201. It is the beginning of the actual adoption process. By tying the beginning of the six-month period to a legally significant, specific date, the General Assembly chose to limit the time period that it determined was relevant

to the trial court's determination to the six-month period immediately preceding that date certain. In this context, "[t]he phrase 'prior to' may be clumsy, but its meaning is clear." Locke, 471 U.S. at 96.

We find this interpretation to be most consistent with the underlying legislative policy embodied by Code § 63.2-1202(H). This statute is a codification of the principle that parental unfitness may be established by proof of abandonment of a child without justification. See Patrick v. Byerley, 228 Va. 691, 694, 325 S.E.2d 99, 101 (1985) ("Abandonment of a child without justification establishes parental unfitness.").[10] Accordingly, we must interpret the statute in a way that is most consistent with the General Assembly's intent to allow the adoption of an abandoned child without the abandoning parent's consent.

Abandonment is the "renunciation or abdication of responsibility over the child . . . or a voluntary relinquishment [of the child] without cause." Keene, 2 Va. App. at 585, 347 S.E.2d at 161; see also Black's Law Dictionary 1 (7th ed. 2000) (defining "abandonment" as "[t]he relinquishing of a right or interest *with the intention of never again claiming it*" (emphasis added)). Abandonment is not, however, incurable, and our prior decisions and the analogous provisions under Title 16.1 of the Virginia Code indicate a policy of encouraging the reunification of parent and child whenever possible. See, e.g., Weaver, 220 Va. at 926, 265 S.E.2d at 695 (noting that statutes terminating the legal relationship between parent and child should be interpreted consistently with the governmental objective of preserving, when possible, the parent-child relationship); Keene, 2 Va. App. at 588, 347 S.E.2d at 162 (stating that a mother

---

[10] While we note that a finding of parental unfitness is sufficient to transfer the custody of a child to a non-parent, it is not enough—standing alone—to justify the termination of parental rights. See Part II.A, supra (discussing the detriment to the child standard); see also Keene, 2 Va. App. at 588, 347 S.E.2d at 161 (collecting cases for the proposition that a showing of abandonment alone is not sufficient for the termination of parental rights in an adoption proceeding).

who had been "deprived of her children for more than a year" was "entitled . . . to an opportunity to demonstrate that she can succeed as a parent").

For instance, Code § 16.1-283(C)(2), which governs the disposition of abused and neglected children who are in the care of social services, provides that parental rights may be terminated only when the parent has been "unwilling or unable, without good cause, within a reasonable period of time not to exceed twelve months from the date the child was placed in foster care to remedy substantially the conditions which led to or required continuation of the child's foster care placement." Code § 16.1-283(C)(1) allows for the termination of parental rights of parents who "have, without good cause, failed to maintain continuing contact with and to provide or substantially plan for the future of the child for a period of six months after the child's placement in foster care." In both of these situations, the natural parents are afforded the assistance of "social, medical, mental health or other rehabilitative agencies." Code § 16.1-283(C)(1), (2). These statutes reflect Virginia's policy of attempting to reunite families when it is possible to do so. Courts resort to the termination of parental rights in these situations only when the parents have exhibited, in the face of assistance from social services over an extended period of time, an intent to abandon one's child to foster care, see Code § 16.1-283(C)(1), or a complete inability to successfully parent one's child, see Code § 16.1-283(C)(2).

The foregoing interpretation of Code § 63.2-1202(H) is consistent with Code § 16.1-283(C) and Virginia's policy of seeking to reunite parents and children whenever possible, because it allows a biological parent who abandons a child for a period of time the same opportunity to cure that abandonment as that afforded a parent whose child is placed in foster care.

### III. CONCLUSION

In sum, we conclude that the trial court erred in its interpretation of Code § 63.2-1202(H), and hold that the statute refers to the six-month period of time immediately preceding the filing of the adoption petition. We also hold that the trial court's application of Code §§ 63.2-1203 and -1205 violated Todd's due process rights because it failed to make the necessary finding under Virginia law that a continuing relationship with her child would be detrimental to the child's welfare. Accordingly, we reverse the trial court's decision and dismiss the adoption petition without prejudice. See Williams, 256 Va. at 22, 501 S.E.2d at 418 (stating that there was no need to remand a case when there was "no allegation or proof that denial of grandparent visitation would be detrimental to this child's welfare").

Reversed and dismissed.